UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                :

CHANEL, INC.,                             :
                                :
                       Plaintiff,   :
                                :
              -against-            :
                                :

THE REALREAL, INC.,                  :
                                :
                     Defendant.  :
                                :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _3/30/2020_

18-CV-10626 (VSB)

**OPINION & ORDER**

Appearances:

Theodore C. Max
Tyler E. Baker
Thomas M. Monahan
Hyo Jin Paik
Sheppard, Mullin, Richter & Hampton LLP
New York, New York
*Counsel for Plaintiff*

Karen L. Dunn
Boise Schiller Flexner LLP
Washington, D.C.
*Counsel for Defendant*

Leigh M. Nathanson
Laura E. Harris
Yotam Barkai
Boies Schiller Flexner LLP
New York, New York
*Counsel for Defendant*

Rollin A. Ransom
Lauren M. De Lilly
Sidley Austin LLP
New York, New York
*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiff Chanel, Inc. ("Plaintiff" or "Chanel") brings this action alleging claims for trademark infringement, counterfeiting, false endorsement, unfair competition, and false advertising under Sections 31(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and several related claims under New York state common and statutory law.  Before me is Defendant The RealReal, Inc.'s ("Defendant" or "The RealReal") motion to dismiss the First Amended Complaint.  Because Chanel adequately alleges that The RealReal marketed and sold counterfeit Chanel products, and because The RealReal's advertising regarding the authenticity of the products it sells is literally false, The RealReal's motion to dismiss Counts Two (trademark counterfeiting/infringement under 15 U.S.C. § 1114(1)(a)), Three (false advertising under 15 U.S.C. § 1125(a)(1)(B)), and Five (unfair competition under New York common law) is DENIED.  However, because The RealReal's use of Chanel's genuine trademarks is not likely to cause customer confusion, and because Chanel has not adequately alleged injury to the public at large, The RealReal's motion to dismiss is GRANTED with respect to Counts One (trademark infringement under 15 U.S.C. § 1114(1)(a)), Four (false endorsement and unfair competition under 15 U.S.C. § 1125(a)(1)(A)), Six (violations of New York General Business Law ("GBL") section 349), and Seven (violations of GBL section 350).

# I.    **Factual Background**[1]

Chanel is an iconic fashion company based in New York, New York that sells luxury fashion products worldwide.  (FAC ¶ 1.)[2]  These products include "bags, shoes, clothing, jewelry, sunglasses, accessories, and beauty products," and Chanel represents itself as "an undisputed leader" in the fashion and beauty industry.  (*Id.* ¶ 15.)  Chanel owns rights to several Chanel and "CC" monogram trademarks that have become associated with Chanel and its luxury designs.  (*Id.* ¶¶ 16–19; *id.* Ex. A ("Chanel Trademarks").)  "Hundreds of millions of dollars' worth of consumer goods are sold each year in the United States under the [Chanel] Trademarks," and "[t]o maintain the prestige of [its] brand," Chanel authorizes certain products, including its handbags, "to be sold only through its own retail stores and carefully selected high-end, prestigious specialty stores, such as Neiman Marcus, Barney's, Nordstrom and Saks Fifth Avenue."  (*Id.* ¶ 24.)  "Chanel's fragrance, cosmetics and sunglasses are only sold online at www.chanel.com and at a limited number of prestigious retailers' specialty stores and websites."  (*Id.*)  Chanel does not sell secondhand or vintage Chanel goods.  (*Id.* ¶ 30.)

---

[1] The following facts are taken from the First Amended Complaint, its accompanying exhibits, and Defendant The RealReal's website, available at https://www.therealreal.com/ ("Def.'s Website").  I assume the factual allegations set forth in the Amended Complaint, its accompanying exhibits, and Defendant's website to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . . Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotations and citations omitted)); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  Chanel's First Amended Complaint relies extensively on The RealReal's website, including the advertising, representations, and guarantees on the website.  (*See e.g.*, FAC ¶¶ 33–35, 38, 45–46, 52, 61.)  Accordingly, pursuant to *Chambers*, I find that Chanel's First Amended Complaint "relies heavily upon [the website's] terms and effect," and thus the website is integral to the First Amended Complaint.  *See XYZ Two Way Radio Serv., Inc. v. Uber Techs.*, Inc., 214 F. Supp. 3d 179, 185 (E.D.N.Y. 2016) (considering a defendant's website in a false advertising and false association case where the plaintiff's complaint referred to certain statements on the website, and stating that "it is only fair to consider those statements in their entirety").  My references to Chanel's allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "FAC" refers to Plaintiff's First Amended Complaint, (Doc. 26).

Defendant The RealReal is a California-based retailer specializing in luxury consignment.  (*Id.* ¶ 31.)  The RealReal currently has "millions of shoppers and consignors, four retail stores in NYC, LA & SF[,] and [ten] Luxury Consignment Offices across the country." (Def.'s Website, About.)[3]  Through The RealReal's website and in its store, customers can purchase and consign used luxury goods pursuant to Defendant's Terms of Service and Consignment Terms.  (FAC ¶ 12.)  In addition to offering many other luxury branded products, The RealReal offers purportedly genuine secondhand Chanel products, and in 2018 acknowledged that Chanel was one of the most popular brands bought and sold through consignment.  (*Id.* ¶ 33; *see also id.* Ex. C, at 7.)  Chanel does not sell to or authorize sales of its products through The RealReal, and does not authenticate The RealReal's inventory of Chanel-branded products.  (*Id.* ¶¶ 30, 37.)

The RealReal represents itself as "the world's largest online marketplace for authenticated, consigned luxury goods."  (Def.'s Website, Investor Relations, Company Profile.)[4]  Indeed, The RealReal's business model and brand are founded on the notion of "AUTHENTICATED LUXURY CONSIGNMENT," (Def.'s Website, About.), and "[a]uthenticity is the cornerstone of The RealReal,"  (FAC Ex. D, at 3.  To maintain consumer trust and confidence in its business model, The RealReal states that it has "developed the most rigorous authentication process in the marketplace," and represents that it is "the only resale company in the world that authenticates every single item sold."  (Def.'s Website, Authenticity: A Letter from Founder & CEO, Julie Wainwright.)[5]  The RealReal further represents that

---

[3] *About*, TheRealReal, https://www.therealreal.com/about (last visited Mar. 30, 2020).

[4] *Investor*, The RealReal, https://investor.therealreal.com/ (last visited Mar. 30, 2020).

[5] *Authenticity, A Letter from Founder & CEO, Julie Wainwright*, The RealReal, https://promotion.therealreal.com/therealreal-experts/# (last visited Mar. 30, 2020).

"[t]here is no other resale company doing more to remove fakes from the market every day and put counterfeiters out of business," that its "dedicated Quality Control team provides an additional layer of control to help prevent fakes from being sold on [its] site," and that its "team works diligently and is constantly innovating to ensure [it] . . . keep[s] fraudulent products off the market." (*Id.*) In its Frequently Asked Questions ("FAQ") page directed at buyers, The RealReal states that "[u]nlike most resale companies, The RealReal takes possession of all items and physically evaluates every item to authenticate it." (Def.'s Website, FAQ: Buyer.)[6] The RealReal's website also includes a FAQ page specifically about its authentication process, which reads as follows:

Questions About The RealReal's Authentication Process

**Q: Are there many fake products on The RealReal?**

**A: We have developed the most rigorous authentication process in the resale marketplace.**

- We are the only resale company in the world that authenticates every single item we sell—and there is no other resale company doing more to remove fakes from the market every day and put counterfeiters out of business.

- We have worked tirelessly to gain and maintain your trust by creating a safe, reputable marketplace for authenticated luxury consignment.

- We employ over 100 brand authenticators, gemologists, horologists and art curators. Our team works diligently and is constantly innovating to ensure we maintain the highest standards and keep fraudulent products off the market.

- Our authentication process and all of our internal processes are changing constantly, driven by new technologies like machine learning and AI.

- We stand behind our business and importantly, if our customers aren't

---

[6] *Frequently Asked Questions, Buyer, What is The RealReal's authentication process?*, The RealReal, https://therealreal.zendesk.com/hc/en-us#buyer (last visited Mar. 30, 2020).

happy, or if they ever question one of our products, we always make it right.

**Q: Is The RealReal's authentication process thorough?**

**A: We have a rigorous, brand-specific authentication process.**

- Items are received and identified as "high risk" or "low risk" based on brand, market value, fashion category, etc. If there is a higher probability for counterfeiting, the product is deemed higher risk in authenticating.

- "High risk" items (anything from an Hermès Birkin bag to the hottest streetwear) are sent to authenticators with significant authentication experience, who are highly specialized in specific categories. Many of these authenticators join The RealReal from the luxury brands themselves—like Tiffany, Hermès and Rolex—or auction houses like Sotheby's and Christie's and have a deep knowledge of the markers, materials and craftsmanship behind genuine products. They assess each item based on these and other characteristics.

- Fine jewelry and watches are authenticated and appraised by our gemologists and horologists, and each piece comes with a valuation certificate. Art items are thoroughly researched and validated by our team of fine art specialists.

- "Low risk" items, such as contemporary brands with clear authenticity markers, are sent to be authenticated by our copywriters, who have a minimum of 30 hours of authentication training.

- Where a copywriter has a question about an item our high-risk authenticators, all of whom have deep experience, are available in person to discuss or review a product.

- Finally our Quality Control team provides an additional layer of control to help prevent fakes from being sold on our site, pulling certain at-risk items for further review. While this extra step takes time, we do not sacrifice quality for quantity.

In addition, as the largest marketplace for authenticated luxury consignment, we have an extensive set of data — which serves as the backbone of our authentication process. For example, data is leveraged to update algorithms to route the highest risk products to our most experienced authenticators, making sure that the "high risk" products get the most scrutiny.

Our team works diligently and is constantly innovating to ensure we maintain the highest standards and keep fraudulent products off the market.

**Q: Are the employees authenticating products experienced?**

**A: Every member of our authentication team, including our copywriters, receives thorough training on all categories of products they authenticate.**

- "High risk" authenticators have significant authentication experience and are highly specialized in specific categories. Many of these authenticators join The RealReal from the luxury brands themselves—like Tiffany, Hermès and Rolex – or auction houses like Sotheby's and Christie's with deep knowledge of the markers, materials and craftsmanship behind genuine products.

- Our copywriters who evaluate "low risk" items receive deep training in authentication. Their titles have become outdated.

    - For context—when we originally launched our business, our copywriters only wrote copy. As our business has grown, the associated scope of their job has changed. Copywriters have been receiving the initial and ongoing training required to authenticate products, which has become an important element of their job.

- Our copywriters currently receive a minimum of 30 hours of training, including during onboarding, job shadowing, daily training sessions and quizzes.

- Where a copywriter has a question about an item, our "Master Authenticators," all of whom have deep experience, are available in person to discuss or review a product.

- All authenticators and copywriters also participate in ongoing training sessions throughout their tenure to identify counterfeiting trends as part of our unrelenting commitment to stay ahead of counterfeiters.

It is essential to us that each employee receives the training they need to feel supported and be successful.

(Def.'s Website, Authenticity: Questions About The RealReal's Authentication Process.)[7] In addition to the above, The RealReal's Terms of Service state the following:

---

[7] *Authenticity: Questions About The RealReal's Authentication Process*, The RealReal, https://promotion.therealreal.com/therealreal-experts/# (last visited Mar. 30, 2020).

**AUTHENTICATION AND BRANDS**

You acknowledge and agree that The RealReal's authentication process is in-house and independent. Brands identified on the Site are not involved in the authentication of the products being sold, and none of the brands sold assumes any responsibility for any products purchased from or through the website. Brands sold on the Site are not partnered or affiliated with The RealReal in any manner. However, The RealReal fully cooperates with brands seeking to track down the source of counterfeit items, which includes revealing the contact information of consignors submitting counterfeit goods. See www.therealreal.com/authenticity.

(Def.'s Website, Terms of Service.)[8]

Customers wishing to sell products through The RealReal must agree to The RealReal's Consignment Terms, which define the consigner's relationship with The RealReal and The RealReal's control over transactions. The Consignment Terms state that while consignors own the goods sold through The RealReal, The RealReal takes possession of all goods sold, and "[u]pon receipt, . . . evaluate[s] each item . . . to determine, in its sole discretion, its authenticity, quality, and value." (Def.'s Website, Consignment Terms.)[9] The Consignment Terms further state that "The RealReal only Accepts Property for consignment . . . that The RealReal determines in its sole discretion to be authentic." (*Id.*) The Consignment Terms also state the following:

If The RealReal cannot confirm the authenticity of any item of Property you have provided, it shall have the right in its sole discretion to refuse to accept the item. If The RealReal determines at any time that an item of Property is counterfeit, The RealReal shall notify you that it has made such a determination and you will have an opportunity to provide proof of purchase/other proof of authenticity acceptable to The RealReal. You acknowledge and agree that any item The RealReal finally determine[d] to be counterfeit will not be returned to you and will be destroyed.

(*Id.*) The Consignment Terms make clear that although consignors retain title to the products

---

[8] *Terms of Service*, The RealReal, https://www.therealreal.com/terms (last visited Mar. 30, 2020).

[9] *Consignment Terms*, The RealReal, https://www.therealreal.com/consignor_terms (last visited Mar. 30, 2020).

offered through The RealReal until final sale—upon which consignors receive a predetermined commission rate[10]—it is The RealReal's responsibility, in its "sole discretion," to price, display, market, and make available for sale the goods sold through its website and retail locations. (*Id.*)

In 2018 and thereafter, Chanel conducted an investigation of The RealReal's Chanel product offerings, and discovered that The RealReal advertised as genuine and authentic at least seven counterfeit Chanel handbags. (*Id.* ¶ 45; *id.* Ex. E.) These counterfeit bags were of a different quality from Chanel's genuine products, and some contained *cartes d'authenticité* with serial numbers that did not correspond to the genuine serial numbers designated by Chanel for those particular styles of handbag. (*Id.* ¶ 46.) Chanel brought this information to The RealReal's attention in June of 2018, in response to which The RealReal asked for additional substantiating information. (*Id.* ¶ 60; *id.* Ex. F.) After the parties' letter correspondence, The RealReal removed the identifying serial numbers from all of its Chanel-branded leather goods product listings, (*id.* ¶¶ 60–61), and The RealReal also possibly removed physical serial number tags from Chanel handbags sold to customers, (*id.* ¶ 64.) In addition, Chanel's complaint references two The RealReal customer reviews in which customers state that they were sold counterfeit Chanel handbags. (*Id.* ¶¶ 63–64.)

Chanel alleges that despite The RealReal's representations regarding its authentication process, The RealReal's authentication experts do not have the necessary qualifications to authenticate Chanel products, and have failed to identify counterfeit Chanel bags. (FAC ¶¶ 34–35, 38, 48.) Chanel further alleges that The RealReal does not disclose sufficient information for consumers to understand that Chanel is not involved in The RealReal's authentication process, or

---

[10] *See RealReal Rewards Commission Levels*, The RealReal, https://www.therealreal.com/commission-chart (last visited Mar. 30, 2020).

affiliated with The RealReal's business.  (*Id.* ¶¶ 37, 39.)  Additionally, Chanel states that The RealReal's advertising of its authentication process is false in light of The RealReal's failures to identify counterfeit goods.  (*Id.* ¶¶ 65–66.)  In light of these allegations, Chanel's First Amended Complaint seeks "to prevent Defendant The RealReal from:  (i) continuing to  mislead consumers into believing that The RealReal has an [] affiliation or association with Chanel and/or that Chanel has approved of or authenticated the second-hand and counterfeit items being sold by The RealReal, and (ii) continuing to sell counterfeit Chanel products."  (FAC ¶ 8.)

## II.    <u>Procedural History</u>

Plaintiff filed the Complaint in this action with six accompanying exhibits on November 14, 2018.  (Doc. 1.)  On January 10, 2019, after I granted Defendant an extension of time to respond to the Complaint, (Doc. 9), Defendant filed a motion to dismiss, (Doc. 16).  Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and my Order dated January 11, 2019, (Doc. 18), Plaintiff filed its First Amended Complaint on February 1, 2019, (Doc. 26).  The First Amended Complaint also included six accompanying exhibits.  (*Id.*)  I entered a modified briefing schedule for Defendant's second motion to dismiss, (Doc. 28), and Defendant filed its motion to dismiss the First Amended Complaint on March 4, 2019, (Doc. 29), in addition to a memorandum of law, (Doc. 30 ("Def. Mem.")).[11]  Plaintiff filed a memorandum of law in opposition to Defendant's motion on April 3, 2019, (Doc. 33 ("Pl. Mem.")), as well as the Declaration of Tyler E. Baker with nine exhibits, (Doc. 32 ("Baker Decl.")).  This motion became fully briefed on April 17, 2019, when Defendant filed a reply memorandum of law in support of its motion to dismiss. (Doc. 34 ("Def. Rep.").)

---

[11] "Def. Mem" refers to the Memorandum of Law in Support of Defendant The Realreal, Inc.'s Motion to Dismiss Plaintiff Chanel, Inc.'s First Amended Complaint For Failure to State a Claim.

### III.    <u>Legal Standard</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237.  "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotations and citation omitted).  A court "may also consider matters of which judicial notice may be taken" in ruling on a motion to dismiss.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.   Discussion

### A.   *Trademark Infringement, Counterfeiting, False Endorsement, and Unfair Competition*

Plaintiff's first two causes of action allege trademark infringement and trademark counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).  (FAC ¶¶ 68–79.)[12] Plaintiff's fourth claim for relief alleges false endorsement and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  (FAC ¶¶ 98–109.)

### 1.   Applicable Law

Section 32(1)(a) of the Lanham Act imposes civil liability on any person who, without the consent of the registrant,

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a).[13]  Courts analyze trademark infringement claims under a two-step test that asks, "first whether the mark 'merits protection' and, second, whether the allegedly

---

[12] Although the First Amended Complaint lists separate counts for trademark infringement and for trademark counterfeiting, both counts are predicated upon the same statute, 15 U.S.C. § 1114(1); however, the counts allege different theories of liability.  (*Id.*)

[13] Section 32(1)(b) of the Lanham Act imposes civil liability on any person who, without authorization,

> reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(b).  However, because Plaintiff does not allege that Defendant itself actually produced the counterfeit goods at issue—indeed, the First Amended Complaint specifically alleges that Defendant offers goods for sale that it obtains from third parties, (FAC ¶ 36)—Plaintiff cannot sustain a trademark counterfeiting claim under section 32(1)(b).  Because Plaintiff's second cause of action cites 15 U.S.C. § 1114(1) generally, I construe Plaintiff's counterfeiting allegations to assert a trademark infringement claim based on the use of counterfeit goods under section 32(1)(a).

infringing use of the mark (or a similar mark) is 'likely to cause consumer confusion.'"

*Victorinox AG v. B&F Sys.*, Inc., 709 F. App'x 44, 47 (2d Cir. 2017), *as amended* (Oct. 4, 2017)

(summary order) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,

696 F.3d 206, 224 (2d Cir. 2012)).[14]

Section 43(a) of the Lanham Act prohibits any person from using in commerce, in

connection with any goods,

> any word, term, name, symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or false or misleading
> representation of fact, which . . . is likely to cause confusion, or to cause mistake,
> or to deceive as to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his or her goods,
> services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1). "The purpose of this section is 'to prevent consumer confusion

regarding a product's source . . . and to enable those that fashion a product to differentiate it from

others on the market.'" *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228

F.3d 56, 61 (2d Cir. 2000) (quoting *Centaur Communications, Ltd. v. A/S/M Communications*,

Inc., 830 F.2d 1217, 1220 (2d Cir. 1987)). The "central inquiry" under Section 43(a) is the

"likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled,

or indeed simply confused, as to the source of the goods in question." *Id.* (citation omitted). The

test utilizes the same principles and standards as are used for trademark infringement claims. *See*

*id.* at 62.

"[A]s a general rule, the Lanham Act does not impose liability for 'the sale of genuine

---

[14] "As to the first prong, a certificate of registration with the [United States Patent and Trademark Office] is prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (internal quotation marks omitted). The RealReal concedes the first prong regarding Plaintiff's registration of its trademarks and does not dispute the validity of the Chanel Trademarks. (*See* FAC Ex. A; Def. Mem. 7.)

goods bearing a true mark even though the sale is not authorized by the mark owner' because such a sale does not inherently cause confusion or dilution." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) (citing *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992). Similarly, the Lanham Act "does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103 (2d Cir. 2010) (quoting *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 308 (2d Cir. 2006). However, a defendant may not use a plaintiff's trademark in a manner that "impl[ies] a false affiliation or endorsement by the plaintiff of the defendant." *Id.* at 102–03. As the Second Circuit has made clear, "satisfaction of the likelihood-of-confusion standard requires a probability of confusion, not a mere possibility." *Guthrie Healthcare Sys.*, 826 F.3d at 37 (internal quotation marks omitted).

Courts in this Circuit apply the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), to determine whether an alleged infringement is likely to cause confusion. *See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016). The *Polaroid* factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)). "No single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand. But it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Id.* (quoting *Arrow Fastener*

*Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995)). "[I]n addition to considering the

*Polaroid* factors, courts are to consider" the following three factors, known as the "nominative

fair use" factors:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*Id.* at 156. "[W]hen considering the third [] factor, courts must not . . . consider only source

confusion, but rather must consider confusion regarding affiliation, sponsorship, or endorsement

by the mark holder." *Id.* at 169.[15]

However, "where counterfeit marks are involved, it is not necessary to perform the step-

by-step examination of each *Polaroid* factor because counterfeit marks are inherently

confusing." *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018)

(citation omitted); *see also, e.g.*, *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 241

(S.D.N.Y. 2013) ("Given that a counterfeit mark is inherently confusing, consumer confusion is

presumed in such cases." (citation omitted)); *Colgate-Palmolive Co. v. J.M.D. All-Star Import*

*and Export Inc.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007); *Lorillard Tobacco Co. v. Jamelis*

---

[15] As Plaintiff notes, "courts have routinely rejected nominative fair use arguments at the motion to dismiss stage because of its inherently factual inquiry." *Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC*, No. 17-CV-5526 (AJN), 2018 WL 4284279, at *5 (S.D.N.Y. Sept. 7, 2018); *see also, e.g.*, *Grand v. Schwarz*, 15-CV-8779 (KMW), 2016 WL 2733133, at *4 (S.D.N.Y. May 10, 2016) ("evaluating [nominative fair use] on a motion to dismiss is inappropriate"). However, Plaintiff's citation to the Second Circuit's decision in *International Information Systems v. Security University, LLC*, 823 F.3d 153 (2d Cir. 2016), for this proposition is completely inapposite and misleading. Indeed, in that case the Second Circuit rejected the notion that nominative fair use was an affirmative defense, implying that it is the Plaintiff's burden to plead sufficient factual content to plausibly allege why Defendant's use of its trademarks is not permissible under the nominative fair use doctrine. *See id.* at 167; *cf. Chanel, Inc. v. WGACA*, LLC, No. 18 Civ. 2253 (LLS), 2018 WL 4440507, at *3 (S.D.N.Y. Sept. 14, 2018) (considering nominative fair use factors at the motion to dismiss stage).

*Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005). "Thus, a fundamental question in determining liability in Trademark Infringement cases involving alleged counterfeit goods is whether the items at issue [ ] are, in fact, counterfeit and whether Defendant[] sold those items." *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 521 (S.D.N.Y. 2019) (internal quotation marks omitted); *see also Spin Master*, 325 F. Supp. 3d at 422 ("The sale of counterfeit goods is sufficient use to establish liability.").

Finally, "wrongful intent is not a prerequisite to an action for trademark infringement [under the Lanham Act] . . . , and [ ] good faith is no defense." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) (internal quotation marks omitted). Rather, "a retailer's direct sale of an infringing product is sufficient to create liability." *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 463 (S.D.N.Y. 2011), *aff'd sub nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc.*, 558 F. App'x 116 (2d Cir. 2014); *see also El Greco Leather Prods. Co. v. Shoe World*, Inc., 806 F.2d 392, 396 (2d Cir. 1986) ("Even though [defendant] was involved neither in the manufacture nor the affixing of the [plaintiff's] trademark to the shoes, its sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement. . . ."). "Strict liability under the Lanham Act does not turn on whether a defendant physically possessed the goods . . . [and] liability may be premised on the 'the sale, offering for sale, distribution, or advertising of any goods or services.'" *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2019 WL 5696148, at *7 (E.D.N.Y. Sept. 30, 2019) (quoting 15 U.S.C. § 1114(1)(a)); *cf. GMA Accessories*, 765 F. Supp. 2d at 464 (denying summary judgment against a defendant who brokered sales where there was no evidence that it "took title to the merchandise, maintained an inventory of merchandise, bore the risk of loss or other traditional indicia of status as seller").

### 2.     Application

Chanel's First Amended Complaint does not plausibly allege trademark infringement, false endorsement, or unfair competition under 15 U.S.C. § 1114(1)(a) or 15 U.S.C. § 1125(a)(1)(A) based on The RealReal's use of genuine Chanel Trademarks.  However, Chanel does plead sufficient facts to plausibly allege a cause of action for trademark infringement under 15 U.S.C. § 1114(1)(a) based on The RealReal's advertisement and sale of counterfeit Chanel products.  I take each theory of liability in turn.

#### a.     The RealReal's Use of Genuine Chanel Trademarks

As the Second Circuit has made clear, the Lanham Act "does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product." *Tiffany (NJ) Inc.*, 600 F.3d at 103 (quoting *Dow Jones & Co.*, 451 F.3d at 308).  Applying the relevant *Polaroid* factors to the instant case, I find that Plaintiff has not sufficiently alleged facts in support of its infringement, false endorsement, or unfair competition claims.[16]  First, Chanel's trademarks are incredibly well-known, recognizable, and prevalent in the luxury fashion market.  Second, although The RealReal's sale of Chanel products in the secondary market may very well compete with Chanel's primary market offerings, the complaint also includes evidence suggesting that secondary fashion markets bolster primary markets.  (FAC Ex. B, at 3 ("What The RealReal recognizes, and the luxury brands may yet have to learn, is that its resale market is

---

[16] This is a case about luxury consignment.  Because of the nature of consignment, I find that many of the *Polaroid* factors are not particularly apt for consideration in this context.  For example, the similarity of the marks, the evidence of bridging the gap, and the respective quality of the products in question are not as relevant where, as here, the marks used and goods sold by Defendant are indeed the same as the Plaintiff's marks and goods.  Such is the nature of resale markets.  For the same reason, I find that the first nominative use factor—whether use of the plaintiff's mark is necessary—is satisfied.

a vital part of the greater luxury market infrastructure.  It helps support first-time sales.  []If you know you can make 80% of [the price] of an item back, you are more likely to go ahead and make the purchase in the primary market[].").)  Additionally, as Chanel makes clear in the First Amended Complaint, "Chanel does not sell secondhand or vintage Chanel goods," and in that sense the RealReal does not directly compete with Chanel.  (FAC ¶ 30.)  Third, Chanel has identified no evidence of actual customer confusion, or that The RealReal has adopted the genuine Chanel Trademarks in bad faith.  And finally, the luxury fashion market is a relatively sophisticated market that involves "[c]elebrities, stylists, and influencers [who] covet Chanel designs and accessories," which "command top-dollar prices."  (FAC ¶ 1.)  Balancing these factors, it is highly unlikely that a customer buying a secondhand Chanel product from The RealReal—which unambiguously holds itself out as consignment retailer in a luxury market— would confuse the nature of The RealReal's business, the source of its products, or its affiliation—or lack thereof—with Chanel.

My conclusion is the same with respect to the second and third nominative fair use factors outlined in *International Information Systems*, 823 F.3d at 156.  Chanel has not plausibly alleged facts suggesting that The RealReal "stepped over the line into a likelihood of confusion by using [Chanel's] mark[s] too prominently or too often, in terms of size, emphasis, or repetition."  *Id.* at 168.  Although The RealReal's website includes a "Chanel" page briefly describing Chanel and advertising products with the Chanel Trademarks,[17]  The RealReal's website also displays these brand-specific pages for nine other luxury fashion brands.  Chanel has identified no facts suggesting that The RealReal displays Chanel-branded goods "more

---

[17] *Chanel*, The RealReal, https://www.therealreal.com/designers/chanel (last visited Mar. 30, 2020).

prominently than other luxury-brand goods," *Chanel, Inc.*, 2018 WL 4440507, at *3, or that The

RealReal uses Chanel marks in any other capacity than to identify Chanel products as Chanel, *cf.*

*PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 256 (6th Cir. 2003) (whether the

defendant "us[ed] [the plaintiff's] trademarks in its domain names, repeat[ed] the marks in the

main titles of the web sites and in the wallpaper underlying the web sites, [or] mimick[ed] the

distinctive fonts of the marks"), *abrogated on other grounds by KP Permanent Make-Up, Inc.*,

543 U.S. 111, 116–17 (2004).  Similarly, Chanel has offered no non-conclusory allegations to

suggest that The RealReal inaccurately depicts its relationship with Chanel or Chanel's products

and services.  Although The RealReal's website states that "[m]any of [its] authenticators join

The RealReal from the luxury brands themselves—like Tiffany, Hermès and Rolex," (Def.'s

Website, Authenticity)—which could suggest to a consumer that brands like Chanel have

indirectly authenticated The RealReal's product offerings—this suggestion, without more, is

insufficient to allege a probability of customer confusion.  This is especially true given The

RealReal's disclosure that "[b]rands identified on [its website] are not involved in the

authentication of the products being sold, and none of the brands sold assumes any responsibility

for any products purchased from or through the website," and that "[b]rands sold on the

[website] are not partnered or affiliated with The RealReal in any manner."[18]  (Def.'s Website,

Terms of Service.); *cf. Tiffany (NJ) Inc.*, 600 F.3d at 103 ("eBay used the mark to describe

accurately the genuine Tiffany goods offered for sale on its website.  And none of eBay's uses of

the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products

through eBay's website.").  Recognizing that another court in this district has stated in an

---

[18] I note that this last statement could be construed as misleading given that The RealReal holds itself out as employing authenticators who were in fact formerly employed by brands themselves.

analogous context that "guarantees of authentication [] themselves may be taken as suggesting sponsorship or endorsement by Chanel," *Chanel, Inc.*, 2018 WL 4440507, at *3, I cannot conclude that such guarantees, without more, are sufficient to demonstrate a likelihood of customer confusion, especially since the law requires "a probability of confusion, not a mere possibility," *Guthrie Healthcare Sys*, 826 F.3d at 37. In *Chanel, Inc.*, Chanel presented evidence that WGACA's retail stores "prominently feature[d] the Chanel brand" through promotional advertising that was Chanel-specific, that its website sold "more Chanel-branded products . . . than those of any other brand," and that its "social media pages include[d] quotations of Coco Chanel" and photographs of Chanel products accompanied by the hashtags "#WGACACHANEL" and "our #WGACACHANEL." 2018 WL 4440507, at *1–2. In addition, WGACA's authenticity guarantees included letters of authenticity stating, for example, "[t]his letter confirms that item Q6HCHK00KB000 Chanel Black Long Tissue Box is an authentic Chanel decoration." *Id.* at *2. Such an authenticity guarantee is materially different from the authenticity statements on The RealReal's website.

### b. The RealReal's Use of Counterfeit Chanel Products

Although Chanel's trademark infringement, false endorsement, and unfair competition claims fail when based on The RealReal's use of the genuine Chanel Trademarks, Chanel does plead sufficient facts to plausibly allege a cause of action for trademark infringement under 15 U.S.C. § 1114(1)(a) on the basis of The RealReal's advertisement and sale of counterfeit Chanel products.

The RealReal argues that its liability for infringement on the basis of counterfeit sales is foreclosed by the Second Circuit's decision in *Tiffany (NJ) Inc. v. eBay Inc.* However, The RealReal's attempt to analogize to *Tiffany* is not persuasive, and the decision itself suggests that a company like The RealReal would be liable for direct infringement based on the sale of

counterfeit goods.  In *Tiffany*, the plaintiff argued that eBay was liable for infringement "because it knew or had reason to know that there was a substantial problem with the sale of counterfeit Tiffany silver jewelry on the eBay website."  600 F.3d at 103 (internal quotation marks omitted).  The Second Circuit rejected this argument and stated the following:

> eBay's knowledge *vel non* that counterfeit Tiffany wares were offered through its website is relevant to the issue of whether eBay contributed to the direct infringement of Tiffany's mark by the counterfeiting vendors themselves, or whether eBay bears liability for false advertising.  But it is not a basis for a claim of direct trademark infringement against eBay, especially inasmuch as it is undisputed that eBay promptly removed all listings that Tiffany challenged as counterfeit and took affirmative steps to identify and remove illegitimate Tiffany goods.  To impose liability because eBay cannot guarantee the genuineness of all of the purported Tiffany products offered on its website would unduly inhibit the lawful resale of genuine Tiffany goods.

*Id.*  However, *Tiffany*'s reasoning is premised on the fact that "eBay did not itself sell counterfeit Tiffany goods; only the fraudulent vendors did," *id.* at 114, which is not the case here.

Recognizing the basis for *Tiffany*'s opinion that eBay could not be held liable for direct infringement based on a vendor's sale of counterfeit goods on the eBay platform, it is clear that The RealReal's business model and Consignment Terms are materially different than those of eBay such that The RealReal can be held liable for direct infringement.  For example, under the Consignment Terms, it is The RealReal's responsibility—in its "sole discretion"—to approve for sale, price, display, market, and make available for sale the goods sold through its website and retail locations.  (Def.'s Website, Consignment Terms.)  In other words, The RealReal retains the power to reject for sale, set prices, and create marketing for goods, and unlike eBay is more than a platform for the sale of goods by vendors.  Also, pursuant to its Consignment Terms, although The RealReal does not "t[ake] title to the merchandise," it "maintain[s] [the] inventory of merchandise," and upon receipt of products from consignors "b[ears] the risk of loss" for the products.  *GMA*, 765 F. Supp. 2d at 464.  Thus, "[e]ven though [The RealReal] [is] involved

neither in the manufacture nor the affixing of [Chanel's] trademark to [any counterfeits], its sale of the [counterfeits] [is] sufficient 'use' for it to be liable for the results of such infringement." *El Greco Leather Prods. Co.*, 806 F.2d at 396; *see also Abbott Labs.*, 2019 WL 5696148, at *7 (E.D.N.Y. Sept. 30, 2019) ("[L]iability may be premised on the 'sale, offering for sale, distribution, or advertising of any goods or services.'" (quoting 15 U.S.C. § 1114(1)(a))).

This conclusion is buttressed by the fact that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Zino Davidoff SA*, 571 F.3d at 243–44 (quoting *El Greco Leather Prods. Co.*, 806 F.2d at 395). By adopting a business model in which The RealReal itself controls a secondary market for trademarked luxury goods, and by curating the products offered through that market and defining the terms on which customers can purchase those products, The RealReal reaps substantial benefit.[19] As a result of this business model, The RealReal must bear the corresponding burden of the potential liability stemming from its "sale, offering for sale, distribution, [and] advertising of" the goods in the market it has created. 15 U.S.C. § 1114(1)(a).

At the motion to dismiss stage, Chanel has adequately averred that its own investigation revealed that The RealReal marketed and sold counterfeit Chanel products, and Chanel has also alleged that The RealReal's own customers have complained about the receipt of counterfeit merchandise. These facts are sufficient to plausibly allege that The RealReal directly infringed Chanel's trademark. Accordingly, because Chanel has alleged sufficient factual content indicating that The RealReal has sold and advertised counterfeit Chanel products, and because

---

[19] Even the Second Circuit's *Tiffany* decision "appreciate[d] the argument that insofar as eBay receive[d] revenue from undetected counterfeit listings and sales through the fees it charge[d], [eBay had] an incentive to permit such listings and sales to continue." *Tiffany (NJ) Inc.*, 600 F.3d at 109 n.14.

the sale or advertisement of counterfeit products is sufficient use to establish liability under Section 1114(1)(a), Chanel's Section 1114(1)(a) claim may proceed on a direct infringement theory. *See, e.g.*, *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 267 (S.D.N.Y. 2011) ("Since Defendants do not contest that they bought and sold counterfeit items containing the Chanel Mark, they have necessarily admitted the likelihood of consumer confusion."); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003) ("The plain language of the relevant statutes does not require that the plaintiff prove that a defendant committed the infringement in any particular amount, or with any amount of regularity. *See* 15 U.S.C. §§ 1114(1) [].  The amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages; the trademark laws do not excuse modest infringements by petty pirates." (internal citation omitted)).

### B.     *False Advertising*

Plaintiff's third cause of action is for false advertising under 15 U.S.C. § 1125(a)(1)(B). (FAC ¶¶ 80–97.)

### 1.     **Applicable Law**

Section 43(a) of the Lanham Act prohibits any person from using in commerce, in connection with any goods,

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a)(1)(B).  "A claim of false advertising may be based on at least one of two theories:  'that the challenged advertisement is literally false, *i.e.*, false on its face,' or 'that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.'" *Tiffany (NJ) Inc.*, 600 F.3d at 112 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d

144, 153 (2d Cir. 2007)).  "[U]nder either theory, the plaintiff must [] demonstrate that the false or misleading representation involved an inherent or material quality of the product."  *Id.* (quoting *Time Warner Cable*, 497 F.3d at 153 n.3).  Additionally, a plaintiff must prove that the challenged advertisement is "the cause of actual or likely injury to the plaintiff."  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255–56 (2d Cir. 2014)).

"To establish literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'"  *Church & Dwight Co.*, 843 F.3d at 65 (quoting *Time Warner Cable, Inc.*, 497 F.3d at 158).  "A message can only be literally false if it is unambiguous."  *Id.*  "If an advertising message is literally false, the 'court may enjoin the use of the message without reference to the advertisement's impact on the buying public.'"  *Id.* (quoting *Tiffany (NJ) Inc.*, 600 F.3d at 112).

"[W]here the statement at issue is not literally false, however, a plaintiff 'must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers,' and must 'demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'"  *Tiffany (NJ) Inc.*, 600 F.3d at 112–13 (quoting *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297–98 (2d Cir. 1992)); *see also Church & Dwight Co.*, 843 F.3d at 65 ("If a message is not literally false, a plaintiff may nonetheless demonstrate that it is impliedly false if the message leaves 'an impression on the listener or viewer that conflicts with reality.'" (quoting *Time Warner Cable*, 497 F.3d at 153)).

However, liability for false advertising extends only to false misrepresentations or statements of fact, and "statements of opinion are generally not the basis for Lanham Act liability." *Groden v. Random House, Inc*., 61 F.3d 1045, 1051 (2d Cir. 1995). Similarly, mere puffing is not actionable, nor are "subjective claims about products, which cannot be proven either true or false." *Lipton v. The Nature Co*., 71 F.3d 464, 474 (2d Cir.1995). The Second Circuit "has had little occasion to explore the concept of puffery in the false advertising context," but has acknowledged two categories of puffery: (1) "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion," and (2) "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *Time Warner*, 497 F.3d at 159–60 (quoting *Pizza Hut, In*c. *v. Papa John's Int'l, Inc*., 227 F.3d 489, 497 (5th Cir. 2000) and citing *Lipton*, 71 F.3d at 474). "Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product." *Castrol Inc. v. Pennzoil Co*., 987 F.2d 939, 945 (3d Cir. 1993).

## 2.      Application

The RealReal's advertisements regarding the authenticity of the products it sells, considered in context, are literally false. Even if I were to conclude otherwise, I would still find that the advertisements are likely to mislead or confuse customers.[20]

The RealReal's tagline is "AUTHENTICATED LUXURY CONSIGNMENT," (Def.'s Website, About), and the company represents that "[a]uthenticity is the cornerstone of The

---

[20] Because I reject Chanel's trademark infringement and false endorsement claims alleging that The RealReal's use of Chanel Trademarks misleads customers into falsely assuming an affiliation between The RealReal and Chanel, I similarly reject Chanel's false advertising claim based on the same allegations. I also find insufficient Chanel's claim of false advertising based on The RealReal's use of the term "vintage." *See Chanel, Inc*., 2018 WL 4440507, at *3 (omitting from its motion to dismiss opinion any discussion regarding the same claim brought in a previous Chanel suit); *Chanel, Inc*., No. 18 Civ. 2253 (LLS), ECF. No. 28.

RealReal," (FAC Ex. D, at 3). The RealReal has "worked tirelessly" to cultivate consumer trust and confidence in its business model by advertising that it has "developed the most rigorous authentication process in the marketplace," a key selling point in the luxury consignment space. (Def.'s Website, Authenticity: A Letter from Founder & CEO, Julie Wainwright.) In this context, The RealReal's statement "we ensure that every item on The RealReal is 100% the real thing," (FAC ¶ 33), is an unambiguous representation of fact that all of the products advertised and sold by The RealReal are 100% authentic.[21] This conclusion is bolstered by The RealReal's representations distinguishing The RealReal from other luxury consignment retailers, including its representation that "[t]here is no other resale company doing more to remove fakes from the market every day and put counterfeiters out of business," that it is "the only resale company in the world that authenticates every single item sold," (Def.'s Website, Authenticity: A Letter from Founder & CEO, Julie Wainwright), and that "[u]nlike most resale companies, The RealReal takes possession of all items and physically evaluates every item to authenticate it," (*Id.*, FAQ: Buyer). In addition, The RealReal holds itself out as employing sophisticated and extensive authentication safeguards, stating, among other things, that it employs "over 100 brand authenticators . . . many of [whom] join The RealReal from the luxury brands themselves," with "every member of [the] authentication team . . . receiv[ing] thorough training on all categories of products they authenticate." (Def.'s Website, Authenticity: Questions About The RealReal's Authentication Process.) The RealReal identifies its authenticators as "experts," and among the

---

[21] Although the parties have not raised this issue, the same could be said of The RealReal's statement that it "authenticates every single item sold." (Def.'s Website, Authenticity: A Letter from Founder & CEO, Julie Wainwright; Def.'s Website, Authenticity: Questions About The RealReal's Authentication Process.) To "authenticate" means "to prove or serve to prove to be real, true, or genuine." *Authenticate*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/authenticate (last visited Mar. 30, 2020). To authenticate does not mean, as The RealReal suggests, to merely "guarantee that each item offered for sale" has gone through The RealReal's "authentication process." (*See* Doc. 30, at 19.)

experts listed on The RealReal's website are four authenticators with particular expertise in authenticating Chanel handbags. (Def.'s Website, Authenticity.) Given Chanel's allegations that certain products advertised and sold by The RealReal are counterfeit, the above context suffices to establish a plausible allegation of literal false advertising based on The RealReal's representation that all the products it offers have been authenticated and are 100% the real thing.

As *Tiffany* made clear, "the law prohibits an advertisement that implies that all of the goods offered on a defendant's website are genuine when in fact . . . a sizeable proportion of them are not." *Tiffany (NJ) Inc.*, 600 F.3d at 114.[22] As *Tiffany* also suggested, it is no response to "warn of the deterrent effect that will grip online advertisers who are unable to confirm the authenticity of all of the goods they advertise for sale." *Id.* Rather, "[a]n online advertiser such as [The RealReal] need not cease its advertisements . . . only because it knows that not all of th[e] goods [offered] are authentic. A disclaimer might suffice." *Id.* The RealReal's own briefing acknowledges that "[The RealReal]'s authentication process may not immediately catch every instance of attempted deception." (Doc. 30, at 24.) However, The RealReal does not point out where on its website or advertising it acknowledges the existence, or even the possibility, of counterfeit products in its marketplace. The same is true of The RealReal's terms of service. The relevant FAQ page on the website poses a question about the number of fake products listed, but in its response does not actually answer the question. Instead, the answer conveys the impression that The RealReal does not sell fake products.

Q: Are there many fake products on The RealReal?

---

[22] To be clear, *Tiffany* does not define what constitutes a "sizeable proportion," and Chanel's allegations are only that The RealReal has "sold at least seven counterfeit Chanel handbags." (FAC ¶¶ 47, 63–64.) The First Amended Complaint does not describe how many Chanel products Chanel investigated when discovering these seven counterfeits, nor does Chanel speculate—and rightly so at this stage—about the ultimate proportion of products offered through The RealReal that are counterfeit.

A: We have developed the most rigorous authentication process in the resale marketplace.

(Def.'s Website, Authenticity: Questions About The RealReal's Authentication Process.)

Although not necessary to my conclusion that The RealReal's authenticity claims constitute false advertising, I find noteworthy the contrast between The RealReal's customer-facing advertisements and its shareholder disclosures.[23] In connection with its initial public offering, The RealReal made the following risk disclosure related to its authentication process:

> Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product . . . . From time to time we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the item. The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.

REAL S-1, Risk Factors at 16. The attempt at transparency evident in the above disclosure paints a much different picture from that conveyed to consumers shopping at The RealReal's stores or on its website. This lack of customer-facing transparency undermines the Lanham Act's goal of "protecting persons engaged in commerce [] against unfair competition." *Lexmark*

---

[23] The RealReal conducted an initial public offering of common stock on May 31, 2019, and filed a Form S-1 Registration Statement pursuant to the Securities Act of 1933. The RealReal, Inc., SEC Form S-1 (filed May 31, 2019), https://www.sec.gov/Archives/edgar/data/1573221/000119312519163007/d720814ds1.htm ("REAL S-1"). Although I do not do so here, courts may rely on "legally required public disclosure documents filed with the SEC" in ruling on a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007).

*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014).[24]

Accordingly, because Chanel has alleged sufficient factual content to plausibly state a claim for false advertisement under 15 U.S.C. § 1125(a)(1)(B) based on The RealReal's authenticity advertisements, The RealReal's motion to dismiss Chanel's 15 U.S.C. § 1125(a)(1)(B) claim is denied.

### C.    *State Law Claims*

Chanel also brings claims for unfair competition in violation of New York common law, deceptive and unfair trade practices in violation of New York General Business Law Section 349, and false advertising in violation of New York General Business Law Section 350.  (FAC ¶¶ 103–118.)

### 1.    **Applicable Law**

"The same standards that govern a Lanham Act claim apply to a claim of unfair competition under New York common law, 'except common law requires a showing of bad faith or intent.'"  *BBK Tobacco & Foods, LLP*, 408 F. Supp. 3d at 522 (quoting *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 598 (S.D.N.Y. 2010), *amended on reconsideration* (Mar. 23, 2010)); *see also Sly Magazine, LLC v. Weider Publications L.L.C.*, 346 F. App'x 721, 723 (2d Cir. 2009) (summary order) ("To prevail on a New York unfair

---

[24] The RealReal argues that Chanel has inadequately pled an injury proximately caused by The RealReal's false advertising.  Chanel has alleged that The RealReal's conduct is "diverting consumer purchases of genuine Chanel goods," and is "harming Chanel's goodwill and reputation by virtue of its misleading advertising and marketing efforts."  I find this to be the type of case "[w]here the injury alleged is so integral an aspect of the violation alleged, there can be no question that proximate cause is satisfied."  *Lexmark Int'l, Inc.*, 572 U.S. at 139 (internal citation omitted).  The basis of Chanel's False Advertising claim is that The RealReal falsely suggests to consumers that all of the Chanel products it offers for sale are genuine.  If this representation is not true, however, Chanel faces direct injury to its trademarks and possible diversion of sales based on The RealReal's circulation of counterfeit Chanel products.  (*See* FAC ¶ 53 ("Defendant The RealReal is earning substantial profits while engaging in counterfeiting activities that use Chanel Trademarks on purported Chanel-branded items when such items are not, in fact, genuine Chanel goods.").)

competition claim, a plaintiff must show either actual confusion or a likelihood of confusion, and there must be some showing of bad faith on the part of the defendants." (internal quotation marks omitted)).  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) (citation omitted).  "Use of a counterfeit mark creates a presumption of bad faith," but only "where defendants were aware of the counterfeiting."  *BBK Tobacco & Foods, LLP*, 408 F. Supp. 3d at 523 (quoting *Fendi Adele*, 689 F. Supp. 2d at 599).

"'[Section 349 of the New York General Business Law] declares deceptive acts and practices unlawful and section 350 declares false advertising unlawful.  The standard for recovery under General Business Law [Section] 350, while specific to false advertising, is otherwise identical to Section 349.  The elements of a cause of action under these statutes are that:  (1) the challenged transaction was 'consumer-oriented'; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff was injured by reason of defendant's deceptive or misleading conduct.'"  *Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 381 (S.D.N.Y. 2019) (quoting *Denenberg v. Rosen*, 897 N.Y.S.2d 391 (1st Dep't 2010)). "While the elements for alleging false advertising and infringement under the General Business Law are otherwise similar to Lanham Act claims," *id.*, a non-consumer plaintiff "must allege conduct that has 'significant ramifications for the public at large,'" *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294-LTS-HBP, 2015 WL 5008762, at *4 (S.D.N.Y. Aug. 24, 2015) (quoting *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003); *see also Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 486–87 (S.D.N.Y. 2002) ("It is well settled . . . that trademark [] infringement

claims are not cognizable under [section 349] unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."). "'Claims that arise out of a trademark infringement action, and disputes between competitors where the core of the claim is harm to another business as opposed to consumers, both constitute situations which courts have found to reflect a public harm that is too insubstantial to satisfy the pleading requirements,' necessary to survive a Rule 12(b)(6) motion." *RCA Trademark Mgmt. S.A.S.*, 2015 WL 5008762, at *4 (quoting *Gucci America*, 277 F. Supp. 2d at 273).

### 2.    Application

Because I reject Chanel's Lanham Act claims premised on The RealReal's use of genuine Chanel Trademarks, I similarly reject Chanel's analogous common law and statutory claims. However, although I find that The RealReal's advertisement and sale of genuine Chanel products does not give rise to state law claims, Chanel has adequately alleged that The RealReal advertised and sold counterfeit Chanel products under circumstances evidencing bad faith. Chanel's First Amended Complaint describes its own investigation of The RealReal's use of counterfeit Chanel products, and Chanel's request that The RealReal cease and desist from offering for sale counterfeit products. The RealReal's response was to remove identifying serial numbers from its Chanel product listings. (FAC ¶¶ 60–61.) Chanel has also alleged that The RealReal possibly removed physical serial number tags from Chanel handbags sold to customers. (*Id.* ¶ 64.) A reasonable inference based on The RealReal's conduct is that it removed product serial numbers from its site and physical products to deprive Chanel and consumers of a legitimate tool for identifying counterfeit goods. Recognizing that discovery might demonstrate that The RealReal had honest motives for removing these serial numbers from its product listings and products, Chanel's allegations are sufficient to allege bad faith at this stage, and its New

York state common law claim can proceed.  Again, this conclusion is limited to Chanel's allegation that The RealReal's marketing and sale of counterfeit Chanel products constitutes unfair competition under New York common law.  Consistent with my reasoning in Part IV(A)(2)(a), *supra*, these factual allegations of bad faith regarding the sale of counterfeit goods do not suggest that The RealReal uses the genuine Chanel Trademarks in bad faith.

With respect to Chanel's Section 349 and 350 claims, Chanel has not demonstrated that this dispute involves injury to the public interest over and above ordinary trademark infringement, which is fatal to Chanel's complaint.  Here, the gravamen of Chanel's First Amended Complaint concerns injury to Chanel and its goodwill, and to a select group of individuals who end up purchasing a counterfeit product.  Chanel's allegations regarding injury to the public at large are conclusory, and Chanel does not identify the allegations in the First Amended Complaint that demonstrate injury to the public over and above an ordinary trademark infringement case.  (*See, e.g.*, FAC ¶ 61 ("The RealReal's [] Conduct . . . creates real and harmful injury to both consumers and to Chanel.  When consumers purchase counterfeit Chanel-branded goods from The RealReal, Chanel suffers reputational harm, as products that are being passed off as genuine (when in fact they are made of substandard materials and/or not manufactured and approved by Chanel) are carried, displayed, and shared in the marketplace. . . . Chanel additionally is harmed th[r]ough the loss of the ability to identify counterfeit goods and to control the quality of its legitimate products by identifying counterfeit CHANEL-branded products in the marketplace.  Consumers that purchase counterfeit products advertised by The RealReal to be "100% authentic" (as supported by The RealReal's purported expert authentication process) are harmed not only by the financial harm of purchasing counterfeit products, but also by the opportunity cost and reputational harm associated with such a purchase.

While significant even on an individual basis, in the aggregate, this harm is substantial and injurious to the public.").)  This is especially true given that The RealReal participates in the luxury fashion market, where products that "command top-dollar prices" are produced in "limited number," (FAC ¶ 1), and are not generally accessible to the public at large.  *Cf. DePinto v. Ashley Scott, Inc*., 635 N.Y.S.2d 215, 217 (1st Dep't 1995) ("the alleged use of confusing labels in the manufacture of women's coats [] does not pose a significant risk of harm to the public health or interest.").  The RealReal's alleged conduct also does not pose a health or safety risk.  *See RCA Trademark Mgmt. S.A.S.*, 2015 WL 5008762, at *4 ("Courts have generally held that the type of injury needed to sustain a trademark violation under these provisions is limited to one that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety.  For example, in *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA, Inc*., the Second Circuit confirmed that a corporate health insurance company had standing to bring a N.Y. GBL § 349 claim against tobacco companies where the allegedly deceptive business practice of the tobacco companies 'induced consumers to smoke and discouraged them from quitting smoking, thus significantly increasing their risk of illness and even death.' 344 F.3d 211, 218 (2d Cir. 2003).").  The cases upon which Chanel relies in arguing that The RealReal's counterfeit sales are alone sufficient to invoke the public interest are cases in which defendants knowingly perpetuated counterfeiting schemes with an intent to deceive customers.  *See Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12 Civ. 8205, 2013 WL 3943267, at *13 (S.D.N.Y. July 31, 2013); *In re Houbigant Inc*., 914 F. Supp. 964, 982 (S.D.N.Y. 1995), *on reargument sub nom. In re Houbigant, Inc.*, 914 F. Supp. 997 (S.D.N.Y. 1996).  This is not such a case, as Chanel has not sufficiently alleged that The RealReal intentionally markets or sells counterfeit goods.

## V.     Conclusion

For the foregoing reasons, Defendant's motion to dismiss the First Amended Complaint is GRANTED IN PART and DENIED IN PART.  Specifically, Defendant's motion is GRANTED with respect to Counts One (trademark infringement under 15 U.S.C. § 1114(1)(a)), Four (false endorsement and unfair competition under 15 U.S.C. § 1125(a)(1)(A)), Six (violations of GBL section 349), and Seven (violations of GBL section 350).  Defendant's motion is DENIED with respect to Counts Two (trademark counterfeiting/infringement under 15 U.S.C. § 1114(1)(a)), Three (false advertising under 15 U.S.C. § 1125(a)(1)(B)), and Five (unfair competition under New York common law).

Accordingly, it is hereby:

ORDERED that Defendant shall have thirty (30) days from the entry of this Opinion & Order to file an answer to the First Amended Complaint.

The Clerk of Court is respectfully directed to terminate the open motion at Document 29.

SO ORDERED.

Dated:  March 30, 2020
        New York, New York

Vernon S. Broderick
United States District Judge

34