**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Chanel Inc.,

            Plaintiff and Counterclaim-
            Defendant,

v.

The RealReal, Inc.,

            Defendant and Counterclaim-
            Plaintiff.

Case No. 18-cv-10626-VSB-GWG

## FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

     Defendant The RealReal, Inc. ("TRR") hereby answers the First Amended Complaint of Plaintiff Chanel, Inc. ("Chanel") filed on February 1, 2019 (the "FAC"), as follows:

     1.     TRR admits that Chanel is an iconic fashion company whose luxury products are advertised and sought worldwide.  TRR admits that Chanel designs are prominently featured in print, television, and social media.  TRR admits that CHANEL products command premium prices, including on the secondary market.  TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 1.

     2.     As to the first sentence of paragraph 2, TRR admits that Chanel purports to bring this action based on TRR's business practices but denies that TRR's business practices are improper.  As to the second, third, fourth, and sixth sentences of paragraph 2, TRR refers to its website and advertisements for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in these sentences.  As to the fourth sentence of paragraph 2, TRR admits that it advertises and sells authentic, secondhand luxury products, including

authentic CHANEL-branded products, which it obtains from third-party consignors.  TRR denies the remaining allegations in paragraph 2.

3.      TRR denies the allegations in paragraph 3, except TRR admits that it presents programming and workshops for consumers, including programming concerning Chanel and programming concerning the authentication of luxury goods, including CHANEL products, and admits that Chanel has not authorized or approved the programming.

4.      TRR admits that there is no current or former approval by or association or affiliation between Chanel and TRR, and TRR otherwise denies the allegations in paragraph 4.

5.      TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 5.

6.      TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 6.

7.      TRR denies the allegations in paragraph 7.

8.      TRR admits that Chanel purports to bring this action for the purposes stated in paragraph 8, but TRR otherwise denies the allegations in paragraph 8.

9.      TRR admits that Chanel asserts the claims and seeks the relief identified in paragraph 9, but TRR otherwise denies the allegations in paragraph 9.

10.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 10.

11.     TRR admits that it is a corporation organized and existing under the laws of Delaware with its principal place of business at 55 Francisco Street, Suite 600, San Francisco, California 94133.

12.     TRR admits the allegations in paragraph 12, except TRR denies that it engages in the sale of counterfeit products.

13.     Paragraph 13 states legal conclusions to which no response is required.

14.     Paragraph 14 states legal conclusions to which no response is required.

15.     TRR admits that Chanel sells a wide variety of luxury consumer products and is a leader in the field of fashion and beauty.  TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 15.

16.     TRR admits that the CHANEL brand and trademarks have enjoyed success and renown.  TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 16.

17.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 17, including in Exhibit A.

18.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 18.

19.     TRR admits that merchandise bearing the CHANEL trademarks is in demand. TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 19.

20.     TRR admits that the CHANEL trademarks have developed significance in the minds of the purchasing public.  TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 20.

21.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 21.

22.     TRR lacks knowledge or information sufficient to form a belief as to the first clause of paragraph 22 and denies the remaining allegations in paragraph 22.

23.     TRR admits that Chanel has advertised and promoted its products, but TRR otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 23 and refers to the referenced publications for a true, accurate, and complete statement of their content.

24.     TRR admits that Chanel sells its consumer goods in the United States and that its products are known in the media and have a reputation for luxury and quality.  TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 24.

25.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 25, except TRR admits that Chanel operates social-media accounts and refers to such accounts for a true, accurate, and complete statement of their content.

26.     TRR admits that Chanel's handbags are recognized by trademarks, and TRR otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 26.

27.     TRR admits that the CHANEL brand and CHANEL Trademarks are recognized among the public at large, and TRR otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 27.

28.     TRR admits that the CHANEL brand and CHANEL Trademarks are famous, well-known, and in demand by consumers, and TRR otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 28.

29.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 29, except TRR admits that certain Chanel leather goods are sold with a serial number on a label within the handbag or other leather good that corresponds with a Chanel authenticity card, and that authenticity cards and serial numbers can be one means of identifying the nature and identity of genuine goods.

30.     TRR denies the allegations in paragraph 30 with the following exceptions: TRR lacks knowledge or information sufficient to form a belief as to the allegations in the second sentence of paragraph 30.  As to the third and fourth sentences of paragraph 30, TRR admits that Chanel does not sell to TRR or authorize sales or distribution through TRR, that Chanel does not authenticate TRR's inventory of CHANEL-branded products as genuine, and that TRR has not obtained the CHANEL products that it offers for sale directly from Chanel.  TRR refers to its website, marketing, advertisements, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content.

31.     TRR denies the allegations in paragraph 31, except TRR admits that it is a retailer that sells pre-owned handbags, jewelry, and apparel and has an online site and brick-and-mortar retail locations for luxury consignment.

32.     TRR denies the allegations in paragraph 32, including in Exhibits B and C, except TRR admits that the article and the report referenced were published and refers to those documents for a true, accurate, and complete statement of their content.

33.     TRR denies the allegations in paragraph 33, except TRR admits that it sells authenticated, secondhand CHANEL products through brick-and-mortar stores and online, and refers to its website, advertisements, Terms of Use, Consignment Terms, and YouTube videos for a true, accurate, and complete statement of their content.

34.     TRR denies the allegations in paragraph 34 and Exhibit D, and TRR refers to its website and advertisements for a true, accurate, and complete statement of their content.

35.     TRR lacks knowledge or information sufficient to form a belief as to allegations concerning consumers' purchasing decisions and denies the remaining allegations in paragraph 35.  TRR refers to its website, advertisements, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content.

36.     TRR admits that it obtains CHANEL-branded products from consignors and not Chanel and denies the remaining allegations in paragraph 36.

37.     The RealReal has developed the most rigorous, brand-specific authentication process in the resale marketplace.  TRR denies the allegations in paragraph 37, except TRR admits that TRR does not rely on Chanel to verify or guarantee the authenticity of the CHANEL products it sells.

38.     TRR denies the allegations in paragraph 38, including footnote 1, except TRR admits that Mr. Wetzbarger and certain of his team members are not former Chanel employees and have not been trained by Chanel.  TRR refers to its marketing materials, website, advertisements, YouTube videos, Terms of Use, and Consignment Terms and Mr. Wetzbarger's alleged representations for a true, accurate, and complete statement of their content.

39.     TRR denies the allegations in paragraph 39 and refers to its website, marketing, advertising, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content.

40.     TRR denies the allegations in paragraph 40.

41.     TRR denies the allegations in paragraph 41 and refers to the referenced FTC document for a true, accurate, and complete statement of its content.

42.     TRR admits the allegations in paragraph 42.

43.     TRR admits the allegations in paragraph 43.

44.     TRR denies the allegations in paragraph 44.

45.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 45, including as to the authenticity of the photos and screenshots in Exhibit E, and TRR refers to its website and advertisements for a true, accurate, and complete statement of their content.

46.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 46.  TRR states that Chanel has not made available to TRR the handbags at issue or Chanel's authentication records such that TRR might investigate Chanel's claims regarding the allegedly counterfeit handbags.

47.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 47 concerning seven allegedly counterfeit CHANEL handbags.  TRR admits that counsel for Chanel represented to TRR that Chanel believed that TRR had sold counterfeit CHANEL-branded products.  TRR refers to its website, advertisements, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 47 and Exhibit D.

48.     TRR denies the allegations in paragraph 48.

49.     TRR denies the allegations in paragraph 49.

50.     TRR refers to its website, advertisements, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content.  TRR lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 50.

51.     TRR denies the allegations in paragraph 51.

52.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of paragraph 52 and denies the allegations in the second sentence of paragraph 52.

53.     TRR denies the allegations in paragraph 53.

54.     TRR admits the allegations in paragraph 54.

55.     TRR denies the allegations in paragraph 55.

56.     TRR denies the allegations in paragraph 56.

57.     TRR denies the allegations in paragraph 57.

58.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 58.

59.     TRR denies the allegations in paragraph 59, except TRR admits that Chanel informed TRR that it believed that certain items sold by TRR were not genuine.

60.     TRR lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of paragraph 60, except TRR admits that Chanel informed TRR that it believed that certain items sold by TRR were not genuine.  TRR denies the allegations in the second sentence of paragraph 60 and states that Chanel has not made available the allegedly counterfeit items or Chanel's authentication records that could allow TRR to investigate Chanel's claims.  As to the third sentence, TRR denies the allegations, except TRR admits that it does not include serial numbers in various product listings on its website, including listings for certain CHANEL-branded products, and that serial numbers were removed from listings at a time after this action was filed.  TRR denies the allegations in the fourth, fifth, and sixth sentences of paragraph 60 and refers to its website, advertisements, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content.  TRR states

that the absence of serial numbers from product listings is a common-sense practice intended to prevent counterfeiters from incorporating legitimate serial numbers into counterfeit goods.

61.     TRR denies the allegations in paragraph 61 and refers to its website, advertisements, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content.

62.     TRR denies the allegations in paragraph 62 and refers to the Better Business Bureau website for a true, accurate, and complete statement of its content.

63.     TRR denies the allegations in paragraph 63 and refers to the alleged customer review for a true, accurate, and complete statement of its content.

64.     TRR denies the allegations in paragraph 64 and refers to the alleged customer review for a true, accurate, and complete statement of its content.

65.     TRR denies the allegations in paragraph 65.

66.     TRR denies the allegations in paragraph 66.

67.     TRR denies the allegations in paragraph 67.

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1))

68.     In its March 30, 2020 Order, the Court dismissed the First Claim for Relief, and for that reason paragraph 68 requires no response.

69.     In its March 30, 2020 Order, the Court dismissed the First Claim for Relief, and for that reason paragraph 69 requires no response.

70.     In its March 30, 2020 Order, the Court dismissed the First Claim for Relief, and for that reason paragraph 70 requires no response.

71.     In its March 30, 2020 Order, the Court dismissed the First Claim for Relief, and for that reason paragraph 71 requires no response.

72.     In its March 30, 2020 Order, the Court dismissed the First Claim for Relief, and for that reason paragraph 72 requires no response.

73.     In its March 30, 2020 Order, the Court dismissed the First Claim for Relief, and for that reason paragraph 73 requires no response.

## SECOND CLAIM FOR RELIEF
## TRADEMARK COUNTERFEITING IN VIOLATION OF 15 U.S.C. 1114(1)

74.     TRR realleges and incorporates its responses to paragraphs 1 through 73 above as if fully set forth herein.

75.     TRR admits that Chanel purports to bring an action on the basis stated in paragraph 75 and denies the remaining allegations.

76.     TRR denies the allegations in paragraph 76.

77.     TRR denies the allegations in paragraph 77.

78.     TRR denies the allegations in paragraph 78.

79.     TRR denies the allegations in paragraph 79.

## THIRD CLAIM FOR RELIEF
## FALSE ADVERTISING IN VIOLATION OF 15 U.S.C. § 1125(A)

80.     TRR realleges and incorporates its responses to paragraphs 1 through 79 above as if fully set forth herein.

81.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 81.

82.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 82.

83.     TRR denies the allegations in paragraph 83.

84.     TRR denies the allegations in paragraph 84.

85.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 85.

86.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 86.

87.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 87.

88.     TRR denies the allegations in paragraph 88.

89.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 89.

90.     TRR refers to its website and product listings for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 90.

91.     TRR lacks knowledge or information sufficient to form a belief as to allegations concerning "Defendant WGACA's products" and denies the remaining allegations in paragraph 91.

92.     TRR denies the allegations in paragraph 92.

93.     TRR denies the allegations in paragraph 93.

94.     TRR refers to its website, advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 94.

95.     TRR refers to its website and product listings for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 95.

96.     TRR denies the allegations in paragraph 96.

97.     TRR denies the allegations in paragraph 97.

## FOURTH[1] CLAIM FOR RELIEF
## FALSE ENDORSEMENT/UNFAIR COMPETITION
## IN VIOLATION OF 15 U.S.C. § 1125(A)

98.     In its March 30, 2020 Order, the Court dismissed the Fourth Claim for Relief, and for that reason paragraph 98 requires no response.

99.     In its March 30, 2020 Order, the Court dismissed the Fourth Claim for Relief, and for that reason paragraph 99 requires no response.

100.     In its March 30, 2020 Order, the Court dismissed the Fourth Claim for Relief, and for that reason paragraph 100 requires no response.

101.     In its March 30, 2020 Order, the Court dismissed the Fourth Claim for Relief, and for that reason paragraph 101 requires no response.

102.     In its March 30, 2020 Order, the Court dismissed the Fourth Claim for Relief, and for that reason paragraph 102 requires no response.

---

[1]     The FAC contains two causes of action that were both designated as "THIRD CLAIM FOR RELIEF." In its March 30, 2020 Order, the Court referred to the second of these causes of action as "Count Four", and renumbered the subsequent counts accordingly. In this Answer, TRR follows the Court's practice in this regard.

**FIFTH CLAIM FOR RELIEF**
**UNFAIR COMPETITION IN VIOLATION OF NEW YORK COMMON LAW**

103.    TRR realleges and incorporates its responses to paragraphs 1 through 102 above as if fully set forth herein.

104.    TRR refers to its website advertising, marketing, Terms of Use, and Consignment Terms for a true, accurate, and complete statement of their content, and TRR otherwise denies the allegations in paragraph 104.

105.    TRR denies the allegations in paragraph 105

106.    TRR denies the allegations in paragraph 106.

107.    TRR denies the allegations in paragraph 107.

108.    TRR denies the allegations in paragraph 108.

109.    TRR denies the allegations in paragraph 109.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW YORK DECEPTIVE**
**AND UNFAIR TRADE PRACTICE**
**ACT IN VIOLATION OF N.Y. GEN. BUS. LAW § 349**

110.    In its March 30, 2020 Order, the Court dismissed the Sixth Claim for Relief, and for that reason paragraph 110 requires no response.

111.    In its March 30, 2020 Order, the Court dismissed the Sixth Claim for Relief, and for that reason paragraph 111 requires no response.

112.    In its March 30, 2020 Order, the Court dismissed the Sixth Claim for Relief, and for that reason paragraph 112 requires no response.

113.    In its March 30, 2020 Order, the Court dismissed the Sixth Claim for Relief, and for that reason paragraph 113 requires no response.

114.    In its March 30, 2020 Order, the Court dismissed the Sixth Claim for Relief, and for that reason paragraph 114 requires no response.

## SEVENTH CLAIM FOR RELIEF
## FALSE ADVERTISING IN VIOLATION OF N.Y. GEN. BUS. LAW § 350

115.    In its March 30, 2020 Order, the Court dismissed the Seventh Claim for Relief, and for that reason paragraph 115 requires no response.

116.    In its March 30, 2020 Order, the Court dismissed the Seventh Claim for Relief, and for that reason paragraph 116 requires no response.

117.    In its March 30, 2020 Order, the Court dismissed the Seventh Claim for Relief, and for that reason paragraph 117 requires no response.

118.    In its March 30, 2020 Order, the Court dismissed the Seventh Claim for Relief, and for that reason paragraph 118 requires no response.

## AFFIRMATIVE DEFENSES

TRR incorporates by reference the foregoing paragraphs in their entirety and asserts the following Affirmative Defenses to the claims set forth in the FAC without assuming the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Chanel.  Nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the allegations in the FAC.  TRR reserves the right to amend or supplement its affirmative defenses as additional facts concerning defenses become known.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1.    The FAC fails to allege facts upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE
### (Waiver)

2.    Chanel's claims are barred, in whole or in part, based on the equitable doctrine of waiver.

### THIRD AFFIRMATIVE DEFENSE
**(Laches)**

3.      Chanel's claims are barred, in whole or in part, based on the equitable doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE
**(Estoppel)**

4.      Chanel's claims are barred, in whole or in part, based on the equitable doctrine of estoppel.

### FIFTH AFFIRMATIVE DEFENSE
**(Acquiescence)**

5.      Chanel's claims are barred, in whole or in part, based on the equitable doctrine of acquiescence.

### SIXTH AFFIRMATIVE DEFENSE
**(Consent)**

6.      Chanel's claims are barred, in whole or in part, because it has consented to the acts complained of.

### SEVENTH AFFIRMATIVE DEFENSE
**(Unclean Hands)**

7.      Chanel's claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

### EIGHTH AFFIRMATIVE DEFENSE
**(Statute of Limitations)**

8.      Chanel's claims are barred, in whole or in part, by applicable statutes of limitations.

## NINTH AFFIRMATIVE DEFENSE
### (Fair Use)

9.      Chanel's claims are barred, in whole or in part, as the acts of TRR alleged therein constitute fair use, nominative fair use, and/or descriptive use.

## TENTH AFFIRMATIVE DEFENSE
### (First Sale Doctrine)

10.      Chanel's claims are barred, in whole or in part, by the first sale doctrine.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Innocent Infringement)

11.      Chanel's claims are barred, in whole or in part, because any alleged infringement by TRR was innocent.

## TWELFTH AFFIRMATIVE DEFENSE
### (Marks Invalid and Unenforceable)

12.      Upon information and belief, the system put in place by Chanel to monitor and supervise the distribution and sale of CHANEL-branded merchandise is so ineffectual that Chanel can no longer distinguish in the marketplace genuine CHANEL-branded goods and counterfeit CHANEL-branded goods, so as to render the Chanel marks asserted herein invalid and unenforceable. Chanel boutiques and authorized retailers are increasingly the target of schemes in which perpetrators purport to "return" counterfeit handbags and pocket the refunds, after which the counterfeit bags are resold to customers as authentic new merchandise.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Materiality)

13.      Chanel's false advertising claims are barred because even if Chanel could show any representation was false, it cannot show the representation was material to consumers or affected consumers' purchasing decisions.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Puffery)

14.     Chanel's false advertising claims are barred because even if Chanel could show any representation was false, these representations constitute non-actionable puffery.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Opinion)

15.     Chanel's false advertising claims are barred because even if Chanel could show any representation was false, these representations constitute non-actionable statements of opinion.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Adequate Remedy at Law)

16.     The alleged injury or damage suffered by Chanel, if any, would adequately be compensated by damages.  Accordingly, Chanel has a complete and adequate remedy at law and is not entitled to equitable relief.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

17.     Chanel's claims are barred, in whole or in part, because of failure to mitigate damages if such exist.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Good Faith)

18.     Chanel's claims are barred, in whole or in part, because TRR acted in good faith.

## NINETEENTH AFFIRMATIVE DEFENSE
### (No Causation)

19.     Chanel's claims are barred, in whole or in part, because Chanel's damages, if any, were not caused by TRR.

### TWENTIETH AFFIRMATIVE DEFENSE
#### (No Damage)

20.    Without admitting that the FAC states a claim, there has been no damage in any amount, manner or at all by reason of any act alleged against TRR in the FAC, and the relief prayed for in the FAC therefore cannot be granted.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
#### (No Punitive Damages)

21.    Chanel's claim for punitive damages is barred, in whole or in part, because punitive damages are not recoverable in cases brought under the Lanham Act.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
#### (Lanham Act Standing)

22.    Chanel's claims are barred, in whole or in part, because even if Chanel could show any representation was false, Chanel has not suffered an injury to a commercial interest in reputation or sales that was caused by TRR's advertising,

### TWENTY-THIRD AFFIRMATIVE DEFENSE
#### (First Amendment)

23.    Chanel's claims are barred, in whole or in part, by the First Amendment to the Constitution of the United States.

### COUNTERCLAIMS

### NATURE OF ACTION AND SUMMARY

1.    Defendant and Counterclaim Plaintiff TRR brings these counterclaims under the antitrust laws of the United States to confront and stop Chanel's illegal efforts to stymie competition that would benefit the customers of TRR and consumers generally.  Faced with a new threat to the core of its business model, which is premised on a limited supply and few access points for consumers, Chanel has waged an aggressive campaign of exclusionary and anticompetitive conduct—including repeated interference with TRR's business relationships—in

an effort to monopolize the market. Chanel has acted illegally to exclude TRR from competing with Chanel in numerous and detailed ways that are about protecting Chanel's growing monopoly power. These illegal acts have damaged TRR as a competitor to Chanel. And when Chanel reacts to new market entrants by employing underhanded, anticompetitive schemes and tactics, it acts contrary not only to its public branding but also to the interests of consumers of Chanel's own products. TRR therefore brings these claims to remedy and stop Chanel's breaches of the antitrust laws.

2.       As set forth in more detail below, Chanel attempted, acquired, and maintained monopoly power in the Relevant Market through a series of exclusionary acts that have meaningfully impaired the growth and development of innovative resale rivals like TRR who threaten Chanel's dominance in the Relevant Market. These exclusionary acts include (a) entering into exclusive contracts with high-end retailers and using its monopoly power to force these retailers to refuse to engage in any ancillary relationship with resale competitors; (b) engaging in a concerted refusal to deal (i.e., a vertical group boycott) with print and digital advertisers that deprived competitors from placing advertisements in the most highly desirable locations; (c) propagating false advertisements representing that Chanel handbags purchased from resellers are "likely to be fake"; (d) wrongly claiming that only Chanel can authenticate pre-owned Chanel handbags in an effort to drive out any competition by secondary resellers.

## PARTIES

3.       Defendant/Counterclaim Plaintiff TRR is a corporation organized and existing under the laws of Delaware with a principal place of business at 55 Francisco Street, Suite 600, San Francisco, California 94133.

4.      TRR is a luxury consignment retailer.  TRR's central mission is empowering consignors and buyers to extend the life cycle of luxury goods to make luxury fashion more sustainable.

5.      Plaintiff/Counterclaim Defendant Chanel is a corporation organized and existing under the laws of the State of New York with a principal place of business at 9 West 57th Street, New York, New York 10019.

6.      Chanel is a co-owned by brothers Alain and Gerard Wertheimer.  In 2019, Chanel reported that it generated $12.3 billion in revenue.  Chanel's owners together are reportedly worth nearly $50 billion and are among the richest people in the world.

## JURISDICTION AND VENUE

7.      This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Sections 349 and 350 of the New York General Business Law, and New York common law.

8.      TRR has been injured, and is likely to continue to be injured, as a direct result of Chanel's unlawful conduct.

9.      The United States District Court for the Southern District of New York has subject matter jurisdiction over this action pursuant to Sections 1331, 1337(a), 1338(a), and 1338(b) of the Judicial Code, 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1338(b); Section 4 of the Clayton Act, 15 U.S.C. § 15(a).  The Court has supplemental jurisdiction over the state law claims under Section 1367(a) of the Judicial Code, 28 U.S.C. § 1367(a).  The Court also has original subject matter jurisdiction over the state law claims under Section 1332(a) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

10.     Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.  Chanel has transported, publicized and sold, products throughout this District.  Venue in this District is also proper pursuant to 28 U.S.C. § 1391(b) because Chanel

resides in this District and is subject to general personal jurisdiction in this District.  Venue is also proper because Chanel commenced an action in this District.

## STATEMENT OF FACTS

I.    **Chanel's Dominance in the Relevant Market for Top Tier Investment Grade and Hold-Value Handbags**

      A.    **The Relevant Market**

11.    The Relevant Market is the market for the sale (both first sale and resale) of top tier investment grade handbags and hold-value handbags.  There are relevant submarkets for top tier investment grade handbags and hold-value handbags, with each constituting an alternative Relevant Market.

12.    The submarket for top tier investment grade handbags is an ultra high-end luxury submarket, in which certain handbags are considered investment material.  Handbags in this submarket are a fast-growing collector's area that constitute an asset class of their own and can generate rates of return higher than the S&P 500.[2]  The top tier investment grade handbag submarket is made up almost entirely of certain handbags by the "Holy Trinity" of Chanel, Louis Vuitton, and Hermes.[3]  Examples of handbags in this market are the Chanel 2.55 classic flap bag and the Boy Bag, the Louis Vuitton Neverfull, and the Hermes Birkin and Kelly.

13.    Handbags in this market are considered a better investment than art and classic cars.[4]  Investment quality bags from these three houses have experienced an average increase in value of 83% in the last 10 years.

---

[2]    Rachel Cormack and Robb Report, *Luxury handbags are the best 'investment of passion,' bringing better returns than fine art, classic cars, and even rare whiskey*, Business Insider (July 2, 2020), https://www.businessinsider.com/luxury-handbags-are-best-performing-investment-asset-class-2020-7; Megan Friedman, *Chanel Bags Are Gaining Value Faster Than the Stock Market*, Harpers Bazaar (June 17, 2016), https://www.harpersbazaar.com/fashion/designers/news/a16188/chanel-handbags-investment-value/.

[3]    Lela London, *Designer Handbags Are Now A Better Investment Than Art*, Forbes (July 1, 2020), https://www.forbes.com/sites/lelalondon/2020/07/01/designer-handbags-are-now-a-better-investment-than-art/#3654359d64c5; Bobby Schuessler, *The Only Bags Worth Investing in Right Now*, Who What Wear (Sep. 27, 2020), https://www.whowhatwear.com/best-luxury-handbags-resale-value.

[4]    Cormack & Report, *supra* note 1.

14.     Industry analysis of top tier investment grade bags includes tracking of resale prices for the bags in this submarket, all of which are from one of the trinity.  An industry index consisting of the bags in this submarket shows that resale prices skyrocketed well past their original retail price when listed for resale.  The market for top tier investment quality handbags is a recognized and fast–growing area for consumers who collect such bags.

15.     Resellers can even earn more than purchase price for top tier investment quality bags with classic styles and shapes depending on their condition.  Studies have found that a classic Chanel bag can be a better investment than a house, with resale prices increasing by as much as 70% per year for certain bags.  The growth in the resale value of the Chanel Medium Classic Flap Bag, for example, has exceeded that of the S&P 500 over the last decade.  Since the Chanel 2.55 was introduced in February 1955, its price increase has far outpaced inflation and since 1990 its pricing has increased exponentially.

16.     Chanel's historical price increases have been significant.  For example, Chanel's Medium Boy Bag was introduced in 2012 at a price point of $3,200 and retailed for $5,000 by 2019.  This represents a 56.25% increase in seven years despite a rate of inflation of approximately 12% during that same time period.  The price hikes are even more significant for other Chanel bags.  The Jumbo Caviar Classic, for example, retailed in 2009 for $2,675 and now retails at $6,400—a 139% increase over 10 years.[5]

17.     The Chanel Classic Flap Bag is an example of a top tier investment grade handbag.  According to some analysts, it makes more economic sense to invest in a Chanel 2.55 Medium Classic Flap bag than in the stock market.  For instance, one index tracking investment level bags found that, from 2004 to 2016, the value of the Chanel 2.55 Medium Classic Flap

---

[5]     Megs Mahoney Dusil, *The Chanel 2019 Price Increase Impacted Majority of Markets*, Purse Blog (Nov. 15, 2019), https://www.purseblog.com/chanel/chanel-2019-price-increase/.

increased by 230%.[6]  The Chanel Boy Bag is another example of an investment grade bag. Since its launch in 2012, the value of a Chanel Boy Bag has increased by 39%.[7]

18.     The submarket for hold-value handbags includes high-end luxury handbags that sell for over $2,000 and retain a resale value of 50% to 100% of the initial sale value.  The submarket for hold-value handbags is also dominated by the "holy trinity."  According to the inaugural Comprehensive Luxury Appraisal Index for Resale (the "Clair Report") published by Rebag in October 2020, "Hermes, Chanel, and Louis Vuitton have not wavered from the upper echelons of brand value, with Hermes handbags maintaining, on average, 80% of their value, while Chanel and LV held 63%."[8]

19.     When a consumer spends a large amount for such an established classic handbag, in addition to enjoying the bag, the consumer wants to know if the bag is investment quality or will retain much of its value.  Consumers who purchase such bags generally understand the resale value and take that into account when evaluating the purchase price of the bag.  These consumers plan and research their purchase, including the investment value or retained value, in advance.

20.      Because a consumer in this market also intends to enjoy the handbag, the purchase of an investment quality or hold-value handbag is not a substitute for other investments. Investment grade and hold-value handbags are characteristically made of durable materials, usually leather, because those bags last longer and wear better over time.   Such handbags also typically conspiculously display logos because bags with such logo branding typically hold their value better than even more expensive bags with minimal logo display.

---

[6]     Angela S. Hwang, *Can your next Chanel bag make you money? Looking at designer bags as alternative investments*, Medium (Jun. 13, 2018), https://medium.com/@angelasoojinhwang/can-your-next-chanel-bag-make-you-money-looking-at-designer-bags-as-alternative-investments-33f3bb1593e4.

[7]     *Luxury Designer Bag Investment Series: Chanel Boy Bag Review – History, Prices 2020,* Save Spend Splurge (Jul. 14, 2020), https://www.savespendsplurge.com/luxury-designer-bag-investment-series-chanel-boy-bag-review-history-prices-2020/.

[8]     *Clair Rebag's 2020 Luxury Resale Report*, Rebag (2020), https://rebag.com/clairreport#value-of-brands.

21.     More common bags and less classic styles are not substitutes for either top tier investment grade bags or hold-value handbags because they neither increase their value nor retain substantial value.

## B. **Chanel's Market and Monopoly Power**

22.     Chanel's brand dominates the robust market for top tier investment grade and hold-value handbags.  At all relevant times, Chanel had and continues to have market and monopoly power in the Relevant Market for top tier investment grade handbags and hold-value handbags.

23.     Chanel commands an over 30% share in the Relevant Market for top tier investment quality handbags and hold-value handbags, with an above 30% to 40% share in the submarket for investment grade handbags, and an above 35% to 50% share in the submarket for hold-value handbags.  Considering its dominance in the submarket for investment grade bags, analysts have described Chanel bags as "the best financial investment you could make" and emphasized that Chanel bags could potentially be a safer financial bet than buying a house.[9]

24.     In part as a result of the anticompetitive scheme alleged herein, Chanel has maintained and enhanced its monopoly power despite the entry of multiple high-quality resale competitors.  Chanel has further engaged in this scheme with the anticompetitive intent of pushing out resellers of Chanel handbags and increasing its own market dominance.

25.     In recent years, Chanel has reduced supply and raised prices for certain handbag styles.  The fact that Chanel's repeated price increases have not led to a loss of sales is direct evidence of Chanel's monopoly power in the Relevant Market for investment grade handbags and hold-value handbags.  Chanel increases prices because it can increase prices.  Chanel's pricing is not constrained by any other luxury brand or any reseller of Chanel products.  As a

---

[9]     Caroline Leaper, *A Chanel bag is officially the best financial investment you could make*, Marie Claire (June 15, 2016), https://www.marieclaire.co.uk/news/fashion-news/chanel-bag-value-increased-by-70-in-the-last-6-years-6053; *A Chanel Bag is a Better Investment than a House,* Yahoo! Finance (Sept. 19, 2016), https://finance.yahoo.com/news/a-chanel-bag-is-a-better-investment-than-a-house-160211651.html.

result, consumers have seen continuous and significant increases in Chanel's handbag pricing. Chanel commands power over price, raising prices and restricting output at will.

26.     The barriers to entry to operate in the market for top tier investment quality handbags and hold-value handbags are high because discerning luxury consumers place a premium on a trustworthy and established brand. It takes time and significant amounts of money to be able to establish a reputation to earn the trust of luxury consumers.

### C.  The Geographic Market

27.     The relevant geographic market is the United States. Chanel sells its products at retailers and boutiques across the United States. Consumers also can purchase authenticated Chanel products online through resellers like TRR, What Goes Around Comes Around ("WGACA"), Farfetch, and other online and brick-and-mortar resale merchandisers.

## II.     Chanel's Dominance Is Threatened by TRR and Other Resellers of Pre-Owned Chanel Handbags.

28.     After decades of near total control, Chanel's dominance in the Relevant Market has been disrupted by innovative resale competitors like TRR who serve a large and previously unmet demand by providing consumers alternative outlets, such as the internet, in which to purchase top tier investment grade and hold-value handbags, including Chanel handbags. Resale competitors thus threaten the very core of Chanel's business model, which is premised on a limited supply and few access points for consumers.

29.     TRR in particular poses a significant threat to Chanel's dominance. TRR has revolutionized the process of luxury resale by dramatically reinventing the way that consumers consign luxury goods and the ease, efficiency, and reliability with which they can do so. As a result, TRR has unlocked luxury supply from first time consignors, converted consignors who typically consign at local brick-and-mortar shops to its online marketplace, and significantly increased repeat consignment rates—providing TRR a rich supply of Chanel handbags that would not otherwise be available to consumers.

30.     TRR offers consumers a well-designed, secure, and easy-to-access internet platform for consumers to purchase authenticated consigned items, including investment grade and hold-value handbags, including those of Chanel.  TRR's platform has made the consignment and purchase of pre-owned Chanel handbags attractive to the type of high-end clientele that are unlikely to patronize other resale sources such as secondhand stores or eBay, creating a robust resale market where none previously existed.

31.     One of the central services that TRR provides its consignors and customers is authentication of all of the listed items on its website, including specialized authentication services for investment grade and hold-value handbags, including those by Chanel.  TRR's website advertises, "[w]ith a rigorous authentication process overseen by experts, The RealReal provides a safe and reliable platform for consumers to buy and sell their luxury items. We have 100+ in-house gemologists, horologists and brand authenticators who inspect thousands of items each day."  TRR employs over 150 brand authenticators, gemologists, and horologists and has developed proprietary brand-specific guides for its authenticators to use.  For each pre-owned Chanel handbag listed on TRR's website, TRR authenticators employ the company's five pillars of authentication, which include factory production codes, hardware, textiles & materials, fonts and typography, and overall construction of the handbag.  TRR's consignors and customers rely on and highly value TRR's authentication services which provide assurance as to the authenticity of the products sold through TRR's platform.

32.     TRR's wide variety of products, authentication services, and easy-to-use platform have generated massive consumer appeal.  Since its founding in 2011, TRR has sold over 12.8 million items and paid out over $1.3 billion to consignors.  In 2018 alone, TRR added 2.6 million new items to its marketplace and sold over three million items to over 582,000 active buyers.  As of March 2019, TRR commanded an impressive 11.4 million members.

33.     Because Chanel's dominance is threatened by TRR and other resellers, Chanel has sought to control the supply of investment grade and hold-value handbags through its investment and partnership with Farfetch.

III.   **Chanel's Anticompetitive Conduct Harms Competition in the Relevant Market and Results in Antitrust Injury.**

A.   **Chanel's Anticompetitive Conduct**

34.      Chanel has illegally attempted, acquired, maintained, and exercised monopoly power in the Relevant Market through an aggressive series of exclusionary and anticompetitive acts.  Chanel has also sought to maintain dominance through its investment and partnership with Farfetch geared towards controlling the availability of inventory in the market.  As a result of this scheme, Chanel has meaningfully impaired rivals who pose a threat to its dominance leading to the anticompetitive effects of lower output, higher prices, and fewer options for consumers. Chanel's actions have also directly harmed TRR, including interfering in its relationships and inhibiting its revenues, exposure, and growth.  Each of Chanel's actions alone constitutes an overt anticompetitive act capable of redress by this Court.  However, it is the totality of these actions to prevent the growth and acceptance of resale competitors that shows the full extent of Chanel's scheme to monopolize the Relevant Market.

1.   *Chanel Limits Supply and Increases Prices to Prevent Its Bags from Becoming Too Ubiquitous.*

35.      A key component of Chanel's dominance in the Relevant Market is its tight-fisted control over supply and distribution of its products.  First sale Chanel handbags are sold only in Chanel boutiques and select "authorized" high-end retailers, which are carefully chosen and monitored, throughout the United States.  Despite the incredible growth of online retail, Chanel has refused to enter into the online marketplace and sell its handbags online.

36.      For the select retailers that are chosen to sell Chanel's products, Chanel tightly controls that experience, providing only limited supply of the select styles of its choosing.  As a result, consumers seeking to purchase Chanel's products are provided only limited options of where they can do so and a limited selection of what they can buy.

37.      When it perceives its bags becoming too ubiquitous, Chanel takes action to limit the available supply.  For example, in recent years, Chanel became concerned that its classic flap

handbag was being carried by too many people "without style," so it reduced supply and significantly increased prices in order to maintain the desirability of its brand and therefore, its dominance in the investment grade and hold-value handbag market.

2.   *Chanel Has Leveraged Its Monopoly Power to Deny Necessary Relationships to Rival Sellers.*

38.     One way Chanel has worked to prevent competitors like TRR from succeeding in the marketplace is by depriving them access to necessary relationships with luxury retailers.  For new entrants in the market like TRR working to gain recognition, reputation, and trust among the consuming public, partnering with other luxury brands is a critical way to gain public recognition and trust.  Among the most important luxury retailers are Saks Fifth Avenue ("Saks") and Neiman Marcus.

39.     TRR recognized the importance of building its brand in connection with high-end retailers and saw an unmet need among the consuming public.  In 2015, TRR pitched and secured a one-year renewable term contract with Neiman Marcus and a six-month contract with Saks for innovative consignment gift card programs.  TRR set up locations within Neiman Marcus and Saks for customers to consign their luxury goods at the stores and offered consignors a premium to exchange their consigned goods for Neiman Marcus or Saks gift cards rather than cash, thus benefitting the retail stores.  In addition to building its reputation by partnering with well-known luxury retailers, TRR also benefitted from having a footprint in established brick-and-mortar stores with access and exposure to a luxury fashion consumer who did not shop online for luxury purchases and may never have consigned before.

40.     Chanel was on notice of TRR's contracts with both Saks and Neiman Marcus.  Signs promoting the partnership were displayed prominently in both stores, including in areas near where Chanel products were sold.  The companies had also begun advertising campaigns to promote the partnerships to a broader audience.

41.     The partnerships succeeded from the start.  Saks, Neiman Marcus, and TRR each devoted significant resources to ensuring the programs ran smoothly.  Each month the number of people participating in the programs grew, and as a result the parties increased the marketing in support of the programs.

42.     By fall of 2015, however, Chanel decided to intervene.  TRR received a call from Neiman Marcus's Chief Marketing Officer, who told TRR that Neiman Marcus had heard from Chanel.  Chanel was unhappy with Neiman Marcus's partnership with TRR and threatened to pull all of its products from Neiman Marcus stores if Neiman Marcus did not make immediate changes to the program.  Specifically, Chanel demanded that Neiman Marcus amend the partnership such that:  (1) no consignor could consign a Chanel product at a Neiman Marcus store (regardless of where the product was originally purchased) and (2) no consignor who received a Neiman Marcus gift card through consignment with TRR could use it on a Chanel product.

43.     To preserve its relationships with consignors—and prevent them from turning to other luxury consignment competitors that could accept Chanel—TRR could not agree to Chanel's demands without materially harming its business.

44.     Neiman Marcus acceded to Chanel's threat and reneged on its partnership with TRR.  Neiman Marcus cancelled its contract with TRR on short notice and before the full year term.  Chanel's power over the market for investment grade and hold-value handbags made it economically infeasible for Neiman Marcus to resist Chanel's demands.

45.     Around the same time, TRR also received a call from Saks insisting on the same changes to the program that Chanel had demanded of Neiman Marcus.  When TRR again declined to agree to the changes Chanel required, Saks similarly agreed with Chanel not to move forward with the partnership with TRR.  Saks cancelled its partnership with TRR shortly after Neiman Marcus ended its contract.

46.     Chanel intentionally caused Neiman Marcus and Saks to breach their respective contracts by terminating their relationships with TRR.  Chanel knew that it had leverage over

Neiman Marcus and Saks and that, if it forced these retailers to choose between Chanel and TRR, Neiman Marcus and Saks would have no reasonable choice but to end their relationships with TRR.  Chanel was right.  Neiman Marcus and Saks each reached an agreement with Chanel to demand untenable changes to the TRR partnerships and, when those changes were not accepted, to terminate the relationships in breach of contractual obligations.

47.     The loss of these partnerships significantly inhibited TRR's business development and growth.  Chanel's interference with TRR's partnership with Neiman Marcus and Saks significantly foreclosed TRR's participation in the Relevant Market for investment grade and hold-value handbags, including Chanel handbags, both by expressly attempting to preclude Neiman Marcus and Saks customers from becoming customers of TRR and by depriving TRR of exposure to existing Chanel customers who shopped at Neiman Marcus and Saks, both authorized Chanel retailers.

48.     Chanel's exclusionary conduct limited the volume of Chanel-branded products that TRR could obtain through consignment and subsequently resell to consumers, prevented TRR from establishing a physical presence in the high-end retail space, and deprived TRR of industry partnerships that would have added legitimacy and trust to its brand at a time when TRR was relatively new to the luxury retail market.  While TRR today does maintain some brick-and-mortar locations that compete with Chanel and cater to consumers used to purchasing luxury products in a physical space, it has been deprived of the ability to expand that footprint into high-end retailers in ways that would be beneficial to both retailers and consumers.  In that way, TRR has been forced to develop alternative and inferior outlets to obtain its products.

49.     Chanel's conduct described above was intended to maintain Chanel's market power and otherwise enable Chanel to continue to increase prices and reduce output of investment grade and hold-value handbags.

3.   *Chanel Deprives Rival Sellers of Access to Advertising.*

50.     Chanel has taken direct and meaningful steps to interfere in TRR's ability to obtain advertisements both in print and online over a period of years.  For example, in late 2015 or early 2016, TRR was in discussions with New York Magazine about a digital and print media campaign.  Although the discussions had progressed substantially, Chanel used its dominance as the most powerful luxury brand to force New York Magazine into an agreement not to deal with TRR.

51.     Chanel did not stop at New York Magazine.  Chanel used its influence to reach agreements with Vogue and The New York Times to refuse to deal with TRR and boycott TRR's advertisements.  In doing so, each of these publications acted contrary to its own economic interest, turning down valuable advertising dollars to accede to Chanel's demands.

52.     The readership of these publications—which are considered the premier print publications in the fashion industry—is the prime demographic of TRR's potential consumers.  Chanel's exclusion of TRR from these publications has meaningfully impaired TRR's ability to market itself to consumers, deprived it of revenues and consignment supply in the Relevant Market, and meaningfully impeded its growth.

53.     Chanel's actions continue to this day.  In 2019, TRR was in discussions with Women's Wear Daily ("WWD") to run an advertisement promoting its recent landmark partnership with luxury brand Burberry.  However, shortly before the ad was set to run, Chanel used its dominance and influence to convince WWD not to run TRR's ads.  WWD informed TRR that it could not run TRR's advertisements as a result of a conflict with one of its "huge partners."

54.     Chanel's repeated coercion of various publications to refuse to deal with TRR constitutes anticompetitive agreements in restraint of trade without any procompetitive justifications.  Indeed, Chanel's coercion of such publications has had the intended effect of sustaining Chanel's market power.

55.     TRR has been meaningfully harmed from the anticompetitive agreements, including because it has lost revenues as a result of the reduced exposure of its brand in the most important print and digital publications and been deprived of consignor supply that would have increased options for consumers and led to increased revenue for TRR.

4. _Chanel Makes False Statements Denigrating All Resellers as "Likely Fake."_

56.     In addition to denying TRR access to advertisements, Chanel has gone on a public campaign against resellers like TRR by publishing misleading statements designed to tarnish their brands, inhibit their growth as competitors, and induce prospective customers to purchase directly from Chanel instead of buying resale.

57.     Chanel states on its website, "There are no authorized sellers of Chanel leather goods, fashion items and watches on the Internet," and Chanel goods purchased from "unauthorized websites are likely to be fake."

58.     Chanel's statement is false and has significant impact on resale competitors. Because Chanel has excluded resellers like TRR from the high-end retail space, TRR and other resale competitors have largely been confined to an online-only marketplace, which Chanel's false statements directly target.  Although TRR has some brick-and-mortar locations, it has been deprived of the ability to partner with high-end luxury retailers to expand its physical presence. Chanel's direct attack on the primary outlet that resale competitors sell investment grade and hold-value handbags—the online marketplace—had meaningful effects on the growth and success of these competitors and helped to maintain Chanel's dominance in the Relevant Market.

59.     Chanel has also engaged in a third-party opposition campaign against TRR and other resale competitors, including retaining consultants.  Such campaign included but was not limited to generating negative stories in the media.

5.   *Chanel Misrepresents Authentication.*

60.     According to Chanel, only Chanel can authenticate Chanel.  Chanel has represented publicly in this lawsuit that the "only way for consumers to absolutely ensure that they are  receiving genuine Chanel products is to purchase such goods from Chanel or from an authorized retailer of Chanel."  Likewise, in its Complaint asserting false advertising claims against TRR, Chanel has asserted that "training and knowledge regarding authentication of genuine CHANEL-branded goods could only reside within Chanel," and that "[o]nly Chanel itself can know what is genuine Chanel."

61.     Chanel made its position clear in a meeting TRR had with Robin Gruber, Vice President of Global Brand Protection of Chanel in 2017.  Gruber explained that Chanel maintains a database of all goods it manufacturers and represented that, without consulting that database, it is impossible to authenticate Chanel items.  Yet, when TRR asked if Chanel would consider licensing access to its database, Gruber responded that Chanel would never share its database.

62.     Chanel's assertion that Chanel's database is the only effective means of authenticating Chanel goods is demonstrably false.  Highly trained experts authenticate items like autographs, baseball cards, and artwork hundreds of years old.  There is nothing so special or distinct about Chanel that it could not similarly be authenticated by a qualified group of experts, including those employed by TRR and others in the industry.

63.     Chanel's *own* process for authenticating Chanel products is flawed.  Chanel bags were involved in the scheme perpetrated by Praepitcha Smatsorabudh in which she would purchase genuine luxury handbags from retailers in the United States and counterfeits of the same bags from overseas, then return the counterfeit to the original retailer and either keep the genuine article (effectively at the price of the counterfeit) or sell it at a profit on the internet.

Customers have complained that they have been sold counterfeit Chanel bags at Chanel boutiques and authorized retailers.[10]

64.     By representing that Chanel's internal database is the only reliable source for authentication information and then restricting access to that database, Chanel is attempting to drive out its competitors who are secondary resellers.

65.     If Chanel were interested in preventing the sale of counterfeit items, it would license its database or provide additional information needed for well-intentioned resellers to authenticate its goods.

66.     Chanel's actions, taken together, constitute a full-scale assault on resale competitors and an effort to continue Chanel's dominance in the market.

> 6.     *Chanel Tolerates Similar Conduct by Farfetch, in Which Chanel Has a "Significant" Investment.*

67.     Notably absent in Chanel's war is one major secondary reseller:  Farfetch. Although notable, Farfetch's absence is far from surprising.  In February 2018, Farfetch's Founder and CEO José Neves announced that Chanel had made a "significant" investment in Farfetch.  At the time, Chanel's President of Fashion Bruno Pavlovsky stated that Farfetch would develop digital initiatives for Chanel, but emphasized that Chanel was "not starting to sell Chanel on the Farfetch marketplace.  Nevertheless,  three Chanel-owned brands—Barrie Knitwear, Goossens, and Maison Michel—joined the Farfetch platform that same year.  In describing this new partnership between Chanel and Farfetch, one media outlet described Chanel as "[w]inning from a [j]uicy [s]ide [h]ustle."[11]

---

[10]   "I was sold a super fake Chanel bag a month ago with an original Chanel receipt. . . . How did this super fake get to Chanel store, why are they not checking the bags when a customer returns it." "So let me understand, Chanel gave your seller a new Chanel bag? So they essentially agreed it was a fake bought at the Chanel store? I'm shocked . . . ." "That's correct. . . . They agreed is [*sic*] was a fake bag as I had the authentication certificate and they went by that instead of investigating the matter first than [*sic*] offering the seller a new bag." *See $1 Million Handbag Scam*, Purse Bop, https://www.pursebop.com/boptalk/topic/1-million-handbag-scam.

[11]   Sissi Cao, *Despite Losing Karl Lagerfeld, Chanel Is Winning from a Juicy Side Hustle*, Observer (Mar. 1, 2019), https://observer.com/2019/03/chanel-backed-farfetch-stock-surge-q4-earning/.

68.     Chanel's "juicy side hustle" with Farfetch is all the more striking given that Farfetch heavily promotes, advertises, markets, and sells pre-owned Chanel goods that are sourced from numerous brick-and-mortar boutiques.  Among Farfetch's boutique partners is A.N.G.E.L.O. Vintage (which Farfetch promotes as a source of "Chanel Vintage") and Amore (which Farfetch describes as the "world's best Chanel Pre-Owned store," and "[h]ome to exclusive Chanel pieces dating from the 1960s").[12]  Farfetch is also directly involved with logistics, storage, shipping, and fulfillment of pre-owned goods from its boutique partners.[13]  Farfetch also heavily promotes the Chanel brand.  For instance, in May 2020, Farfetch launched the promotion and sale of "iconic archival Chanel pieces" spanning from 1988 to 1991 from the "rare vintage specialist store Rewind."  And like TRR and WGACA, Farfetch guarantees the authenticity of all of its pre-owned items.  In its Frequently Asked Questions, Farfetch asserts that  "100%" of its items are authentic, and states that its "offering is expertly curated from the best luxury fashion around the globe and we guarantee all items are authentic."[14]

69.     Additionally, Farfetch recently expanded its e-commerce platform to include the resale of luxury handbags from individual consignors.  In May 2019, Farfetch announced the launch of its pilot program "Farfetch Second Life," which bills itself as "a new service to enable you to make space in your wardrobe by selling your bags in exchange for credits to spend on Farfetch."[15]  Farfetch only accepts handbags from a few dozen brands—one of which is Chanel—and explicitly provides that "your bag does not have to be bought from Farfetch originally, you can sell any bag from our list of accepted brands."[16]  Farfetch's website states:

---

[12]  *Amore*, Farfetch, https://www.farfetch.com/boutiques-all.aspx.

[13]  Danny Parisi, *Amid store closures, Farfetch is working to keep its boutique partners afloat*, Glossy (Mar. 25, 2020), https://www.glossy.co/fashion/amid-store-closures-farfetch-is-trying-to-keep-its-boutique-partners-afloat.  Further, during the COVID-19 pandemic, "[b]outiques have begun storing product in Farfetch's warehouses, including its hundreds of micro-warehouses in nearly every major market" to ensure continuation of services and fulfillment of orders.  *Id.*

[14]  *Farfetch FAQs*, https://www.farfetch.com/faqs/.

[15]  *Farfetch Second Life*, https://secondlife.farfetch.com/; *see also Farfetch Unveils Handbag Pilot Re-Sale Service, Farfetch Second Life*, Farfetch (May 13, 2019), https://aboutfarfetch.com/news/press-releases/farfetch-unveils-handbag-pilot-re-sale-service-farfetch-second-life-as-part-of-its-sustainability-strategy-positively-farfetch/.

[16]  *Frequently Asked Question*, Farfetch Second Life, https://secondlife.farfetch.com/faq.

"*We [Farfetch] work with in-house and third-party experts to ensure the authentication of the items we receive. We have a rigorous process to ensure that all items meet our authenticity standards*."

70.     Similarly, as announced late last year, "Farfetch is moving further into secondhand retail in partnership with Thrift+," which is a second-hand clothing donation service company from Farfetch's startup accelerator program.[17]  Among the items sold on the Thrift+ website are Chanel clothing, shoes, and accessories.

71.     Ultimately, Chanel will only tolerate the resale of Chanel handbags – including those that are top tier investment and hold-value handbags – by a company in which Chanel holds a significant investment so that it can continue to control supply and prices in the market for top tier investment grade and hold-value handbags.   This became all the more apparent by correspondence between Chanel and Farfetch that recently became publicly available in the *WGACA* litigation.  On August 14, 2020, TRR learned for the first time that, in November 2018, Chanel's outside counsel (in fact, the same counsel as in this litigation) sent Farfetch a cease and desist letter detailing similar allegations as those at issue in this litigation, but that Chanel declined to pursue any legal action against Farfetch.  As disclosed in the *WGACA* litigation, Farfetch did not respond in the normal course and instead suggested that the companies' business relationship should dictate their course of dealings on the issues raised in the letter:  "*Given the existing relationship between Farfetch and Chanel*, we will pick up the contents of the letter with Chanel directly."[18]  Apparently Chanel agreed; the matter appears to have ended there, and Farfetch continues to authenticate and resell Chanel goods to this day.

---

[17]     Maghan McDowell, *Farfetch launches clothing donation programme*, Vogue Business (Oct. 8, 2019), https://www.voguebusiness.com/companies/farfetch-recommerce-thrift-circular-resale.
[18]     *Chanel, Inc. v. WGACA LLC*, No. 18-cv-2253 (LLS), ECF 129-2, 137-1 (emphasis added).

**B.  Chanel's Exclusionary Scheme Harmed Competition in the Relevant Market.**

72.     The combination of Chanel's exclusionary conduct has resulted in a substantial impairment in the growth and entry of resale competitors in the Relevant Market and has resulted in tangible harm to TRR and the consuming public.

73.     Chanel's overarching anticompetitive scheme has led to at least the following harm in the Relevant Market:  (1) reduced supply of top tier investment grade and hold-value handbags, (2) fewer options for consumers for where and how to purchase top tier investment grade and hold-value handbags, (3) the limitation of innovation from the entry and growth of competitors, (4) supracompetitive prices for consumers for top tier investment grade and hold-value handbags, and (5) increased market dominance by Chanel.

74.     There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint or for any aspect of the anticompetitive conduct standing alone.  Even if there were, however, there are less restrictive means of achieving any purported procompetitive effects.

**C.  TRR Suffered Antitrust Injury**

75.     As a direct and proximate result of Chanel's anticompetitive conduct, as alleged herein, TRR obtained substantially lower revenues than it would have obtained in a competitive market.  Because of Chanel's actions, TRR was:  (1) deprived of meaningful relationships with high-end retailers, (2) excluded completely from placing advertisements in some of the most desirable print and digital locations, (3) disparaged by Chanel's false advertising campaign, and (4) deprived of access to the essential database, according to Chanel, needed to authenticate Chanel products, which could have avoided this litigation.

76.     The individual and collective impact of Chanel's actions on TRR's business has been substantial.  Although TRR has been able to succeed and find a presence in the Relevant Market, its market position is a sliver of what it could and would be in a competitive market, and

it has not been able to bring new, efficient, and desirable consumer innovations to its customers because of Chanel's conduct.

## IV.   **Interstate Commerce**

77.     Chanel engages in interstate commerce and in activities substantially affecting interstate commerce including through (1) nationwide marketing and promotional efforts for its products and (2) the distribution and sale of its products throughout the United States.

## V.   **Intrastate Commerce**

78.     Both Chanel and TRR engage in intrastate commerce and in activities substantially affecting intrastate commerce in New York.

79.     Chanel has its headquarters and flagship store in New York City, New York.

80.     Chanel sells fashion goods, including fashion goods, extensively in New York and the greater New York City area.  Chanel fashion items are sold at four Chanel boutiques, including a Neiman Marcus store, as well as Bergdorf Goodman, Saks Fifth Avenue, Bloomingdale's, Jeffrey, and The Webster in New York City; Neiman Marcus in White Plains, New York; Hirshleifer's in Manhasset, New York; and Saks Fifth Avenue in Huntington Station, New York.  Serving the greater New York City area, Chanel fashion items are sold at a Chanel boutique in Short Hills, New Jersey, Neiman Marcus in Short Hills and Paramus, New Jersey, and at Saks Fifth Avenue in Greenwich, Connecticut.

81.     TRR operates two brick-and-mortar retail stores in New York City, New York, as well as one Luxury Consignment Office at which TRR accepts goods for consignment and provides other ancillary services.

82.     TRR has over 39,800 consignors and over 93,500 customers located in New York, which is over 24% of its consignor base and 15% of its customer base.

83.     New York City is known as an international hub of luxury retail and fashion.

**FIRST CLAIM FOR RELIEF**

<u>**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**</u>
**(Concerted Refusal to Deal – Group Boycott –  Publishers )**

84.     TRR incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

85.     Chanel entered into agreements with publishers including Women's Wear Daily, New York Magazine, Vogue, and the New York Times to refuse to accept advertisements or otherwise deal with TRR.

86.     These agreements and their enforcement substantially, unreasonably, and unduly restrain trade in the Relevant Market and harmed TRR in at least the following ways:

    a.   The agreements constitute concerted refusals to deal, in which the parties refused to do business with TRR despite the fact that these agreements would have been economically advantageous for the publishers;

    b.   The agreements alone and together with other restraints as pled herein have as an end an intended consequence of coercing or pressuring publishers to deal only with Chanel and not with any other competitor in the Relevant Market;

    c.   The agreements constitute unlawful vertical restraints of trade.

87.     The agreements with publishers restrain a sufficiently substantial portion of effective advertising in the Relevant Market to the detriment of competition.

88.     The agreements with publishers had at least the following effects:

    a.   To deprive TRR of important means of accessing potential consumers and consignors;

    b.   To deprive TRR of the ability to build its reputation and brand in some of the most important digital and print publications.

89.     The publisher agreements have created barriers to entry, limited the supply and variety of products available, inhibited the growth and development of competitors, and artificially raised and maintained the price paid by consumers in the Relevant Market.

90.     Chanel also entered into agreements with luxury retailers Saks and Neiman Marcus to require changes to these retailers' partnerships with TRR.  These agreements and their enforcement substantially, unreasonably, and unduly restrain trade in the Relevant Market and harmed TRR in at least the following ways:

      a.     The agreements constitute concerted refusals to deal, in which the parties refused to do business with TRR on terms that would have otherwise existed in a competitive market;

      b.     The agreements alone and together with other restraints as pled herein have as an end an intended consequence of coercing or pressuring retailers to deal only with Chanel and not with any other competitor in the Relevant Market;

      c.     The agreements constitute unlawful vertical restraints of trade.

91.     The agreements with Saks and Neiman Marcus restrain a sufficiently substantial portion of effective sales in the Relevant Market to the detriment of competition.

92.     The agreements with Saks and Neiman Marcus had at least the following effects:

      a.     To deprive TRR of important means of accessing potential consumers and consignors;

      b.     To deprive TRR of the ability to access two of the most important luxury retailers that would enhance its ability to compete in the Relevant Market.

93.     The agreements with Saks and Neiman Marcus have created barriers to entry, limited the supply and variety of products available, inhibited the growth and development of competitors, and artificially raised and maintained the price paid by consumers in the Relevant Markets.

94.     Chanel also made a significant investment and entered into a partnership with Farfetch in order to control the influx of high-end investment grade handbags in the Relevant Market.  This partnership and its enforcement substantially, unreasonably, and unduly restrain trade in the Relevant Markets and harmed TRR in at least the following ways:

      a.   Chanel's significant investment in and partnership with Farfetch alone and together with other restraints as pled herein have as an end an intended consequence of reducing output and other anti-competitive effects.

95.     Chanel is liable for the creation, maintenance, and enforcement of the above-referenced agreements with publishers and Saks and Neiman Marcus.

## SECOND CLAIM FOR RELIEF

## MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2

96.     TRR incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

97.     The relevant geographic market is the United States.

98.     The Relevant Market is the sale of top tier investment grade and hold-value handbags, including both first sale and resale.

99.     Chanel has attempted to monopolize the Relevant Market for top tier investment grade and hold-value handbags as shown by both direct evidence of its ability to raise prices and restrict output and indirect evidence of its dominant market share in the Relevant Market.

100.    Chanel has obtained, enhanced, maintained, and attempted to assert dominance in the Relevant Market through the exclusionary scheme alleged herein.  Chanel has used and continues to use its power to inhibit the growth of or eliminate entirely other competitors in the Relevant Market, including by (1) depriving these competitors of access to necessary relationships with high-end retailers at brick-and-mortar locations, (2) excluding them from advertising in the most desirable print and digital locations, (3) making false advertisements characterizing their products as "likely to be fake," and (4) claiming that only Chanel can authenticate Chanel handbags while denying competitors access to the authentication database Chanel claims is required to authenticate an item.

101.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, TRR has suffered injury and damages in the form of reduced revenues and lost profits in amounts to be proven at trial.

**THIRD CLAIM FOR RELIEF**

**ANTICOMPETITIVE ARRANGEMENT, AGREEMENT, AND COMBINATION IN VIOLATION OF THE DONNELLY ACT, N.Y. GEN. BUS. LAW § 340**

102.    TRR incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

103.    Chanel's anticompetitive and exclusionary scheme as set forth above involves unlawful anticompetitive arrangements, agreements, combinations, and other reciprocal conduct among Chanel and retailers and advertisers, and this conduct that renders Chanel liable under the Sherman Act for monopolization also renders Chanel liable under the Donnelly Act.

104.    Chanel has engaged in a series of unlawful arrangements, agreements, and combinations with retailers including Neiman Marcus and Saks, in which Chanel and the retailers agreed to refuse to deal with TRR even on economically advantageous terms and thereby exclude TRR from the most desirable high-end retail space.

105.    Chanel has also engaged in a series of unlawful arrangements, agreements, and combinations with advertisers, including Women's Wear Daily, New York Magazine, Vogue, and the New York Times, in which Chanel and the advertisers agreed to refuse to deal with TRR even on economically advantageous terms and thereby exclude TRR from the most sought-after advertising space.

106.    A monopoly may not be maintained if it restrains competition in the conduct of any business, trade, or commerce or in the furnishing of any service in New York.  The arrangements, combinations, and agreements between Chanel and retailers and advertisers have

restrained and continue to restrain competition in the market for investment grade and hold-value handbags in New York.

107.    As a direct and proximate result of this continuing violation of the Donnelly Act, TRR has suffered injury and damages in the form of reduced revenues and lost profits in amounts to be proven at trial.

108.    The unlawful contracts, agreements, arrangements, combinations, and conspiracies will continue unless permanently enjoined and restrained.  TRR is entitled to an injunction that terminates the ongoing violations set forth above.

## FOURTH CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH CONTRACT

109.    TRR incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

110.    TRR had a valid and enforceable contract with Neiman Marcus over a one-year renewable term to issue Neiman Marcus gift cards to consignors in lieu of cash consignment commissions, thereby incentivizing consignors both to consign items—including Chanel-branded items—with TRR and to purchase new items—including Chanel-branded items—from Neiman Marcus, to the benefit of both parties.

111.    At all relevant times, Chanel was aware of TRR's contract with Neiman Marcus.

112.    By reason of the acts set forth above, Chanel intentionally interfered with TRR's contract with Neiman Marcus, including demanding the amendment of critical terms of the contract to exclude the consignment and purchase of Chanel-branded items from its scope and, when TRR would not acquiesce in changes to those terms that would have reduced the benefits flowing to TRR under the contract, demanding that Neiman Marcus terminate the contract before the expiration of the current term thereof.

113.    Chanel intended to cause Neiman Marcus to breach the contract by demanding changes to the terms of an already executed contract and separately by inducing Neiman Marcus to terminate its relationship with TRR.  Chanel knew that it had leverage over Neiman Marcus

and if it forced Neiman Marcus to choose between Chanel and TRR, Neiman Marcus would be forced to end its relationship with TRR in order to maintain its relationship with Chanel.

114.    As a result of Chanel's intentional interference, Neiman Marcus actually and materially breached its contract with TRR by terminating the contract prior to the expiration of the definite term of one year, without even purporting to have any cause justifying early termination enumerated in the contract.

115.    As a result of Chanel's intentional interference, TRR suffered damages in an amount to be determined at trial, in the form of lost profits that TRR would have reaped from the consignments of consignors who were drawn to TRR by the incentives offered under the program, as well as a loss of goodwill and future profits from consignors who were surprised and disappointed by the sudden reversal of the partnership between TRR and Neiman Marcus.

116.    TRR had a valid and enforceable contract with Saks over a six-month term to issue Saks gift cards to consignors in lieu of cash consignment commissions, thereby incentivizing consignors both to consign items—including Chanel-branded items—with TRR and to purchase new items—including Chanel-branded items—from Saks, to the benefit of both parties.

117.    As a result of Chanel's intentional interference, Saks actually and materially breached its contract with TRR by first demanding changes to the terms of an already executed contract and separately by inducing Saks to terminate its contract.

118.    By reason of the acts set forth above, Chanel intentionally interfered with TRR's contract with Saks, including demanding the renegotiation of critical terms of the contract to exclude the consignment and purchase of Chanel-branded items from its scope and, when TRR would not acquiesce in changes to those terms that would have reduced the benefits flowing to TRR under the contract, demanding that Neiman Marcus terminate the contract before the expiration of the current term thereof.

119.    Chanel intended to cause Saks to breach the contract by demanding changes to the terms of an already executed contract and separately by inducing Saks to terminate its

relationship with TRR.  Chanel knew that it had leverage over Saks and if it forced Saks to choose between Chanel and TRR, Saks would be forced to end its relationship with TRR in order to maintain its relationship with Chanel.

120.    As a result of Chanel's intentional interference, Saks actually and materially breached its contract with TRR by terminating the contract.

121.    As a result of Chanel's intentional interference, TRR suffered damages in an amount to be determined at trial, in the form of lost profits that TRR would have reaped from the consignments of consignors who were drawn to TRR by the incentives offered under the program, as well as a loss of goodwill and future profits from consignors who were surprised and disappointed by the sudden termination of the partnership between TRR and Saks.

### FIFTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

122.    TRR incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

123.    As alleged above, TRR was engaged in discussions with publishers including Women's Wear Daily, New York Magazine, Vogue, and the New York Times for partnerships and an expectation of prospective economic benefits from such relationships to TRR.

124.    Chanel was aware of the business relationships between TRR and Women's Wear Daily, New York Magazine, Vogue, and the New York Times.

125.    By reason of the acts set forth above, Chanel intentionally interfered with TRR's partnerships with these publishers, including by demanding that these publishers not accept any advertisements from TRR despite the fact that these publishers would have received an economic benefit from doing so.

126.    As a result of Chanel's intentional and wrongful interference, the above-mentioned publishers severed its business relationship with TRR.

127.    As a result of Chanel's intentional and wrongful interference, TRR suffered damages in an amount to be determined at trial, in the form of lost profits that TRR would have

reaped from the increased exposure and advertising in some of the most desirable print and digital media locations, as well as a loss of goodwill and brand reputation from having been denied these partnerships, and lost future profits from consignors who would have consigned with TRR but were not exposed to TRR as a result of Chanel's interference.

128.     Chanel's interference with TRR's business relations constituted an independent crime or tort, as Chanel's actions were anticompetitive in nature and comprised a violation of the antitrust laws of the United States and New York.

## DEMAND FOR JUDGMENT

WHEREFORE, The RealReal, respectfully asks the Court for a judgment that:

a.  Awards TRR treble the amount of damages actually sustained by reason of the antitrust violations alleged herein;

b.  Awards TRR damages, penalties and other monetary relief provided by applicable law;

c.  Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by Chanel's unlawful conduct;

d.  Awards TRR its costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest;

e.  Any other relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

Dated: February 25, 2021                    Respectfully submitted,


                                            /s/ Karen L. Dunn
                                            Karen L. Dunn
                                            William A. Isaacson
                                            PAUL, WEISS, RIFKIND, WHARTON
                                              & GARRISON LLP
                                            2001 K Street, NW
                                            Washington, DC 20006-1047
                                            (202) 223-7300
                                            kdunn@paulweiss.com
                                            wisaacson@paulweiss.com

                                            Leigh M. Nathanson
                                            Laura E. Harris
                                            KING & SPALDING LLP
                                            1185 Avenue of the Americas, 36th Floor
                                            New York, NY 10036
                                            (212) 556-2100
                                            lnathanson@kslaw.com
                                            lharris@kslaw.com

                                            *Counsel for Defendant and Counterclaim-Plaintiff
                                            The RealReal, Inc.*