**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHANEL, INC., | |
| Plaintiff and Counterclaim-Defendant, | |
| v. | Civil Action No. 1:18-cv-10626-VSB-GWG |
| THE REALREAL, INC., | |
| Defendant and Counterclaim-Plaintiff. | |

**DEFENDANT THE REALREAL, INC.'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S  MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS AND
MOTION TO STRIKE DEFENDANT'S SEVENTH AFFIRMATIVE DEFENSE**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Tel: (202) 223-7300

KING & SPALDING
1185 Avenue of the Americas 34th Floor
New York, NY 10036
Tel: (212) 556-2100

*Counsel for Defendant and Counterclaim-Plaintiff
The RealReal, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................3

I.    TRR States Plausible Claims for Actual and Attempted Monopolization under
      Section 2 of the Sherman Act. ........................................................................3

      A.    TRR Alleges Two Relevant Markets:  The Sale of Top Tier Investment
            Grade Handbags and of Hold-Value Handbags.....................................4

      B.    TRR Alleges "Market Power" Supporting Actual and Attempted
            Monopolization ...................................................................................8

            1.    TRR Alleges "Monopoly Power" Demonstrating Actual
                  Monopolization ........................................................................8

            2.    TRR Alleges "Market Power" Demonstrating a "Dangerous
                  Probability" of Chanel Achieving a Monopoly to Support
                  Attempted Monopolization .......................................................12

            3.    TRR Alleges that Chanel Alone Has Monopolized and Attempted
                  to Monopolize the Relevant Markets..........................................14

      C.    TRR Alleges that Chanel Engaged in Anticompetitive Conduct Aimed at
            Excluding Competition .........................................................................15

      D.    TRR Alleges that Chanel Has Injured Market-Wide Competition.......................18

      E.    TRR Alleges that Chanel Has a "Specific Intent" to Monopolize the
            Relevant Markets ................................................................................19

II.   TRR's Counterclaims State Plausible Antitrust Claims under Section 1 of the
      Sherman Act and the Donnelly Act .................................................................20

III.  TRR States Plausible Tortious Interference Claims .........................................22

      A.    TRR Plausibly Alleges That Chanel Tortiously Interfered with TRR's
            Contracts with Retailers.......................................................................22

      B.    TRR Plausibly Alleges That Chanel Tortiously Interfered with TRR's
            Prospective Business Relationships with Publishers ...........................23

IV.   TRR's Counterclaims Are Timely ...................................................................24

V.    The Court Should Deny Chanel's Motion to Strike TRR's Unclean Hands
      Affirmative Defense.......................................................................................28

CONCLUSION....................................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AD/SAT, a Div. of Skylight, Inc.* v. *Associated Press*,
   920 F. Supp. 1287 (S.D.N.Y. 1996)..................................................................................21

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*,
   181 F.3d 216 (2d Cir. 1999).................................................................................12, 13, 21

*Affinity LLC* v. *GfK Mediamark Research & Intelligence, LLC*,
   547 F. App'x 54 (2d Cir. 2013) ........................................................................................17

*All Star Carts & Vehicles, Inc.* v. *BFI Can. Income Fund.*,
   887 F. Supp. 2d 448 (E.D.N.Y. 2012) .............................................................................12

*Am. Needle, Inc.* v. *Nat'l Football League*,
   560 U.S. 183 (2010)..........................................................................................................20

*Andre* v. *Schenectady Cty.*,
   No. 95-CV-573, 1997 WL 135910 (N.D.N.Y. Mar. 13, 1997) .........................................26

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009)........................................................................................................3, 14

*Bayer Schera Pharma AG* v. *Sandoz, Inc.*,
   No. 08 CIV.03710 (PGG) 2010 WL 1222012 (S.D.N.Y. Mar. 29, 2010).........................12

*Bayer Schering Pharma AG* v. *Sandoz, Inc.*,
   813 F. Supp.2d 569 ........................................................................................................8, 14

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)........................................................................................................3, 16

*Brager & Co.* v. *Leumi Sec. Corp.*,
   429 F. Supp. 1341 (S.D.N.Y. 1977), *aff'd*, 646 F.2d 559 (2d Cir. 1980) ..................................4

*Broadcom Corp.* v. *Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)...............................................................................................8

*Broadway Delivery Corp.* v. *United Parcel Serv. of Am., Inc.*,
   651 F.2d 122 (2d Cir. 1981)...........................................................................................9, 10

*Carl Zeiss Stiftung* v. *V.E.B. Carl Zeiss, Jena*,
   298 F. Supp. 1309 (S.D.N.Y. 1969)................................................................................29, 30

*Coca-Cola Co.* v. *Howard Johnson Co.*,
   386 F. Supp. 330 (N.D. Ga. 1974) ......................................................................30

*Concord Assocs., L.P.* v. *Ent. Properties Tr.*,
   817 F.3d 46 (2d Cir. 2016)................................................................................4

*In re Currency Conversion Fee Antitrust Litigation*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011).................................................................21

*Energex Lighting Corp.* v. *N. Am. Philips Lighting Corp.*,
   No. 83 Civ. 3929 (SWK), 1990 WL 83528 (S.D.N.Y. June 12, 1990) .....................9

*Estee Lauder, Inc.* v. *Fragrance Counter, Inc.*,
   189 F.R.D. 269 (S.D.N.Y. 1999) ......................................................................29

*Eveready Wholesale Drugs, Ltd.* v. *Pfizer, Inc.*,
    No. 04-cv-6590, 2006 U.S. Dist. LEXIS 36677 (S.D.N.Y. June 5, 2006) ..............16

*Falstaff Brewing Co.* v. *Stroh Brewery Co.*,
   628 F. Supp. 822 (N.D. Cal. 1986) ....................................................................19

*Florida Seed Co.* v. *Monsanto Co.*,
   105 F.3d 1372 (11th Cir. 1997) ........................................................................18

*Foam Supplies, Inc.* v. *The Dow Chemical Co.*,
   No. 05-CV-1772 (CDP), 2007 WL 4210354 (E.D. Mo. Nov. 27, 2007) ................14

*Four Seasons Solar Products Corp.* v. *Sun System*,
   101 F.R.D. 292 (E.D.N.Y. 1983)..................................................................26, 27

*France Telecom S.A.* v. *Novell, Inc.*
   No. 102-437- GMS, 2002 U.S. Dist. LEXIS 19967 (D. Del. Oct. 17, 2002) ..........29

*Gary Friedrich Enterprises, LLC* v. *Marvel Enterprises, Inc.*,
   08 Civ. 1533(BSJ)(JCF), 2011 WL 13262163 (S.D.N.Y. May 4, 2011) ...............26

*Geneva Pharm. Tech. Corp.* v. *Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004).................................................................................7

*Gucci Am., Inc.* v. *Exclusive Imports Int'l*,
   No. 99 Civ.11490 (RCC)(FM), 2001 WL 21253 (S.D.N.Y. Jan. 9, 2001)..............27

*H.L. Hayden Co. of N.Y.* v. *Siemens Med. Sys., Inc.*,
   879 F.2d 1005 (2d Cir. 1989).............................................................................15

*Haagen-Dazs, Inc.* v. *Frusen Gladie Ltd.*,
   493 F. Supp. 73 (S.D.N.Y. 1980)........................................................................29

*Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*,
   392 U.S. 418 (1968).................................................................................................25

*Hayden Pub. Co.* v. *Cox Broad. Corp.*,
   730 F.2d 64 (2d Cir. 1984).........................................................................................9

*Italian & French Wine Co. of Buffalo* v. *Negociants U.S.A., Inc.*,
   842 F. Supp. 693 (W.D.N.Y. 1993) ........................................................................23

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) (Broderick, J.), *recon. denied*, No. 14-
   MD-2542 (VSB), 2019 WL 2603187 (S.D.N.Y. June 25, 2019) ................................... *passim*

*Louisiana Wholesale Drug Co.* v. *Sanofi-Aventis*,
   No. 07 CIV. 7343 (HB), 2008 WL 169362 (S.D.N.Y. Jan. 18, 2008) .....................5

*M&M Med. Supplies & Servs., Inc.* v. *Pleasant Valley Hosp. Inc.*,
   981 F.2d 160 (4th Cir. 1992) .............................................................................8, 13

*Mb Sportswear* v. *Vf Outdoor*,
   2007 U.S. Dist. LEXIS 118397 (S.D.N.Y. Apr. 13, 2007)...............................19, 30

*Michael E. Jones, M.D., P.C.* v. *Aetna, Inc.*,
   No. 19-cv-9683, 2020 U.S. Dist. LEXIS 174440 (S.D.N.Y. Sept. 23, 2020) ........10

*Nat'l Ass'n of Pharm. Mfrs., Inc.* v. *Ayerst Labs., Div. & Am. Home Prod. Corp.*,
   850 F.2d 904 (2d Cir. 1988).....................................................................................17

*Natsource LLC* v. *GFI Grp., Inc.*,
   332 F. Supp. 2d 626 (S.D.N.Y. 2004)......................................................................13

*New Paradigm Software Corp.* v. *New Era of Networks, Inc.*,
   107 F. Supp. 2d 325 (S.D.N.Y. 2000)......................................................................22

*New York Citizens Comm. on Cable TV* v. *Manhattan Cable TV, Inc.*,
   651 F. Supp. 802 (S.D.N.Y. 1986)............................................................................7

*New York Jets LLC* v. *Cablevision Sys. Corp.*,
   No. 05 CIV. 2875(HB), 2005 WL 2649330 (S.D.N.Y. Oct. 17, 2005) .................4, 7

*New York* v. *Actavis, PLC*,
   No. 14-cv-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom.*
   *N.Y. ex rel. Schneiderman* v. *Actavis PLC*, 787 F.3d 638 (2d Cir. 2015).................9

*Nifty Foods Corp.* v. *Great Atl. & Pac. Tea Co.*
   614 F.2d 832 (2d Cir. 1980).................................................................................9, 10

*Obabueki* v. *Int'l Bus. Machines Corp.*
    145 F. Supp. 2d 371 (S.D.N.Y. 2001)........................................................................28

*Optronic Techs., Inc.* v. *Ningbo Sunny Elec. Co.*,
    No. 5:16-CV-06370 (EJD), 2020 WL 1667435 (N.D. Cal. Apr. 3, 2020) .............................13

*Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009)........................................................................................12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    562 F. Supp. 2d 392 (E.D.N.Y. 2008) .................................................................8, 9

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)................................................................................10

*Philip Morris Inc.* v. *Heinrich*,
    No. 95 CIV. 0328 (LMM), 1996 WL 363156 (S.D.N.Y. June 25, 1996) ........................25, 26

*Reading Intern., Inc.* v. *Oaktree Cap. Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)......................................................................24

*Reed Constr. Data Inc.* v. *McGraw-Hill Cos.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................................17

*Rite Aid Corp.* v. *Am. Exp. Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) .....................................................................25

*Rome Ambulatory Surgical Ctr., LLC* v. *Rome Mem'l Hosp., Inc.*,
    349 F. Supp. 2d 389 (N.D.N.Y. 2004)........................................................................4

*RSM Prod. Corp.* v. *Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)......................................................................22

*Scutti Enterprises, L.L.C.* v. *Park Place Entertainment Corp.*,
    322 F.3d 211 (2d Cir. 2003)................................................................................23

*Simon-Whelan* v. *Andy Warhol Found. for the Visual Arts, Inc.*,
    No. 07 CIV. 6423(LTS), 2009 WL 1457177 (S.D.N.Y. May 26, 2009)................................25

*Six W. Retail Acquisition, Inc.* v. *Sony Theatre Mgmt. Corp.*,
    No. 97-cv-5499, 2004 U.S. Dist. LEXIS 5411 (S.D.N.Y. Mar. 31, 2004).............................14

*Skyline Steel, LLC* v. *Pilepro, LLC*,
    No. 13-CV-8171, 2015 WL 999981 (S.D.N.Y. 2015)........................................................26

*Starr* v. *Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)...........................................................................16, 22

*Todd* v. *Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)....................................................................4, 5

*Tops Markets, Inc.* v. *Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998)......................................................................3, 8

*Twin Labs., Inc.* v. *Weider Health & Fitness*,
  900 F.2d 566 (2d Cir. 1990)..................................................................13, 14

*Ulrich* v. *Moody's Corp.*,
  No. 13-cv-0008, 2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014).........................26

*United Air Lines, Inc.* v. *Austin Travel Corp.*,
  681 F. Supp. 176 (S.D.N.Y. 1988)................................................................10

*United Air Lines, Inc.* v. *Austin Travel Corp.*,
  867 F.2d 737(2d Cir. 1989)........................................................................10

*United Artists Corp.* v. *Masterpiece Prods., Inc.*,
  221 F.2d 213 (2d Cir. 1955).......................................................................27

*United States* v. *Aluminum Co. of Am.*,
  148 F.2d 416 (2d Cir. 1945).......................................................................10

*United States* v. *Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003).........................................................................9

*US Football League* v. *Nat'l Football League*,
  634 F. Supp. 1155 (S.D.N.Y. 1986).........................................................17, 18

*Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*,
   540 u.s. 398 (2004) .................................................................................18

*Virgin Atl. Airways Ltd.* v. *British Airways PLC*,
  872 F. Supp. 52 (S.D.N.Y. 1994)..................................................................13

*Virgin Enterprises Ltd.* v. *Virginic LLC,* No. 19-CV-0220, 2020 WL 1845232 (D.
  Wyo. Apr. 10, 2020)  ...............................................................................30

*Washington Ave. Assocs., Inc.* v. *Euclid Equip., Inc.*,
  229 A.D.2d 486 (2d Dep't 1996)..................................................................22

*Xerox Corp.* v. *Lantronix, Inc.*,
  342 F. Supp. 3d 362 (W.D.N.Y. 2018) ...........................................................3

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.*,
  401 U.S. 321 (1971)..................................................................................25

*In re Zinc Antitrust Litigation,*
  155 F. Supp. 3d 337 (S.D.N.Y. 2016)................................................................15, 19

**Statutes and Rules**

Sherman Act, 15 U.S.C. § 1 ................................................................................... *passim*

Sherman Act, 15 U.S.C. § 2 ................................................................................... *passim*

28 U.S.C. § 1331 ...................................................................................................26

Fed. R. Civ. P. 13(a) ............................................................................................26

Fed. R. Civ. P. 15(c)(1)(B) ..................................................................................27

Fed. R. Civ. P. 12(b)(6).........................................................................................3

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501 (2020) .........................................12

## PRELIMINARY STATEMENT

Over the past six years, Chanel has taken numerous, significant anticompetitive actions with the same intended effect:  to prevent and exclude The RealReal ("TRR") and other luxury resellers from selling Chanel handbags with the result of adverse effects on competition, including higher prices and lower output.  Chanel's actions include:  (1) limiting supply when it perceives its bags as too ubiquitous or being carried by too many people "without style"; (2) telling its consumers that Chanel goods bought on websites like TRR are "likely to be fake"; (3) taking the position that only Chanel can authenticate its handbags because "[o]nly Chanel itself can know what is genuine Chanel," while simultaneously refusing to license its authentication database; (4) using its monopoly power to cause retailers like Neiman Marcus and Saks to terminate partnerships with TRR; (5) using its monopoly power to cause publishers to cease advertising and marketing negotiations with TRR; and (6) and engaging in similar conduct with a reseller in which Chanel has a "significant" investment.  These allegations are at the heart of TRR's antitrust counterclaims under Section 1 and Section 2 of the Sherman Act and New York's Donnelly Act, TRR's tortious interference counterclaims under New York law, and TRR's unclean hands affirmative defense.

Chanel seeks to ignore or minimize these factual allegations in its motion to dismiss all of TRR's counterclaims and in its motion to strike TRR's unclean hands affirmative defense.  None of Chanel's arguments has any merit.

***First,*** Chanel's contention that TRR's monopolization and attempted monopolization claims under Section 2 are implausible and insufficient on their face ignores or distorts controlling case law and does not address the fact-intensive inquiry required to define the relevant market. Chanel attacks TRR's Relevant Markets of investment grade and hold-value handbags as "gerrymandered" and "arbitrary," while also claiming that Chanel cannot be a monopolist because it is but one of many brands in a thriving, competitive market.  In making these arguments, Chanel

ignores (and seeks to avoid altogether) the fact-intensive inquiry as to what constitutes a relevant market based on the specific facts alleged in the Complaint. Chanel falsely claims—despite binding Second Circuit precedent to the contrary—that Chanel's alleged market share of over 30% to 50% in the Relevant Markets is insufficient as *a matter of law* to show market power for either monopolization or attempted monopolization. Chanel's singular focus on market share is a transparent attempt to distract from TRR's other allegations supporting the inference of Chanel's market power—all part of a heavily fact-dependent inquiry that Chanel entirely ignores, and which precludes dismissal on the pleadings. Likewise, Chanel ignores most of TRR's extensive allegations demonstrating that Chanel has engaged in anticompetitive conduct aimed at excluding competition, that Chanel acted with a specific intent to do so in the Relevant Markets, and that Chanel's conduct injured market-wide competition.

**Second,** Chanel's attack on TRR's Section 1 and Donnelly Act claims, which involve a series of anticompetitive and illegal vertical agreements, mischaracterizes TRR's counterclaims as alleging a vast hub-and-spoke conspiracy between and among each of Chanel, two retailers, and four publishers. That is not the basis for TRR's Section 1 or Donnelly Act claims: rather, TRR alleges that *Chanel* entered into a series of illegal vertical agreements with each. Chanel does not posit any legitimate ground for dismissal of the claim TRR does allege.

**Third,** despite Chanel's conclusory assertions otherwise, TRR alleges each element necessary for tortious interference with contractual relations or prospective business relations. TRR alleges that Chanel caused Neiman Marcus and Saks to breach their contracts with TRR.

**Fourth,** Chanel's challenge on timeliness grounds is incorrect on the law and the facts. TRR alleges actionable conduct by Chanel well within the applicable statute of limitations for both the antitrust claims and the tortious interference claim with respect to Women's Wear Daily

("WWD").  And earlier conduct from 2015 and 2016 is actionable under both the continuing violation doctrine for antitrust claims and tolling doctrines for compulsory counterclaims.

*Finally*, Chanel's motion to strike TRR's unclean hands affirmative defense is both untimely and premature.  Chanel has been on notice of the basis of the defense for *years* and offers no justification for its sudden and belated motion to strike before discovery is complete.  Chanel's merits arguments are fact-based and better resolved after discovery and on summary judgment.

## ARGUMENT

A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.  *Xerox Corp.* v. *Lantronix, Inc*., 342 F. Supp. 3d 362, 367 (W.D.N.Y. 2018) (internal quotations and citation omitted).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a counterclaim need only contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544,  570 (2007)).  Because TRR has stated plausible counterclaims, Chanel's motion to dismiss should be denied.

**I.      TRR States Plausible Claims for Actual and Attempted Monopolization under Section 2 of the Sherman Act**

To establish a Section 2 violation for actual monopolization, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*., 383 F. Supp. 3d 187, 219 (S.D.N.Y. 2019) (Broderick, J.), *recon. denied*, No. 14-MD-2542 (VSB), 2019 WL 2603187 (S.D.N.Y. June 25, 2019); *see also Tops Markets, Inc.* v. *Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998).   Relatedly, to establish attempted monopolization under Section 2, a plaintiff must allege "a specific intent to obtain a

monopoly in the relevant market coupled with conduct evidencing a dangerous probability that the attempt will be successful." *Brager & Co.* v. *Leumi Sec. Corp.*, 429 F. Supp. 1341, 1346-47 (S.D.N.Y. 1977), *aff'd*, 646 F.2d 559 (2d Cir. 1980) (denying motion to dismiss Sherman Act claims). The "latter element is usually satisfied by showing that the defendant possesses sufficient market power to render his anticompetitive conduct likely to effect the desired result." *Id.* at 1347.

### A.   TRR Alleges Two Relevant Markets:   The Sale of Top Tier Investment Grade Handbags and of Hold-Value Handbags[1]

The determination of what constitutes a relevant market "involves a deeply fact-intensive inquiry and courts are hesitant to grant motions to dismiss for failure to plead the relevant product market."[2] *New York Jets LLC* v. *Cablevision Sys. Corp.*, No. 05 CIV. 2875(HB), 2005 WL 2649330, at *5 (S.D.N.Y. Oct. 17, 2005) (quotations and citations omitted); *see also Todd* v. *Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *In re Keurig*, 383 F. Supp. 3d at 226-27, ("[t]he cross-elasticity of demand analysis depends on information about consumer behavior and perceptions and is accordingly 'a deeply fact-intensive inquiry.'") (quotations and citations omitted). TRR plausibly alleges why the market should be defined as it is; any further determination of market definition should occur after discovery.

TRR alleges that the relevant market is the market for the sale of (1) top tier investment grade handbags, and (2) hold-value handbags, and that there are relevant submarkets for top tier

---

[1]   TRR also alleges a relevant market including both the sale of top tier investment grade handbags and the sale of hold-value handbags. (Countercl. ¶ 11.) This market survives for the same reasons discussed in this section.

[2]   Indeed, many of Chanel's cases are summary judgment decisions. *See, e.g., Rome Ambulatory Surgical Ctr., LLC* v. *Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 419 (N.D.N.Y. 2004) (denying summary judgment motion because plaintiff demonstrated that significant market actors did not view defendants' proposed substitute suppliers as actual substitutes). Even Chanel's cases concerning the relevant market at the motion to dismiss stage note that market definition is a "deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage." *Concord Assocs., L.P.* v. *Ent. Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).

investment grade handbags and hold-value handbags, *with each constituting an alternative Relevant Market*. (Countercl. ¶ 11.) TRR alleges that the submarket for top tier investment grand handbags consists of ultra high-end luxury handbags that are considered investment material such that the value of the handbag *increases* over time, and that the submarket for hold-value handbags includes high-end luxury handbags that sell for over $2,000 and retain a resale value of 50% to 100% of the initial sale value. (*Id.* ¶¶ 12, 18.)

*First*, Chanel appears to concede that TRR alleges a relevant market for investment grade handbags given that Chanel's brief is entirely focused on attacking the relevant market for hold-value handbags. (MTD 8-11.) Chanel could not succeed on such an argument because on "a motion to dismiss, a plaintiff need only allege a 'plausible' relevant market," which is defined as "all products reasonably interchangeable by consumers for the same purposes, since this constrains a firm's ability to raise prices above competitive level." *Louisiana Wholesale Drug Co.* v. *Sanofi-Aventis*, No. 07 CIV. 7343 (HB), 2008 WL 169362, at *7 (S.D.N.Y. Jan. 18, 2008). The Court at this stage need not decide whether it agrees with the pleading of each one of the relevant markets in the counterclaims. *See Todd*, 275 F.3d at 204.

TRR has easily satisfied this requirement by alleging that investment grade handbags "constitute an asset class of their own and can generate rates of return higher than the S&P 500" and that handbags in this market "are considered a better investment than art and classic cars." (Countercl. ¶¶ 12, 13.) This market is "a recognized and fast-growing area for consumers who collect such bags," and "[w]hen a consumer spends a large amount for such an established classic handbag . . . the consumer wants to know if the bag is investment quality." (*Id.* ¶¶ 14, 19.) As TRR alleges, "[b]ecause a consumer in this market also intends to enjoy the handbag," there is no substitute purchase. (*Id.* ¶ 20.) Chanel does not contest any of these allegations.

In a footnote, Chanel argues that TRR "offers no explanation" as to why bags that increase in value are different from bags that do not.  (MTD 9 n.5.)  But Chanel ignores the market reality that, as TRR alleges, consumers who purchase investment grade handbags specifically seek bags that are an asset class of their own—*i.e.*, handbags that *increase* in value over time and serve as an investment.  (Countercl. ¶¶ 12-17.)  Further, Chanel's references to the 14 competing brands in the luxury handbag market described in the Clair Report (which TRR refers to in support of the hold-value market) are misguided because the Clair Report does not discuss investment bags.  As TRR alleges, a separate "industry index" tracks resale prices for investment grade bags and shows that all of the bags in that market are from the "trinity" (*i.e.*, Chanel, Hermes, and Louis Vuitton).  (*Id.* ¶ 14.)

***Second,*** Chanel attacks the relevant market for hold-value handbags as "arbitrary" and "gerrymandered."  For example, Chanel argues that the Clair Report includes analysis of fourteen different brands selling handbags which average in resale value from $500 to almost $8,000.  (MTD 9 n.5, 11.)  Chanel argues that "TRR neither provides any plausible justification for these arbitrary criteria . . . nor any plausible explanation why a handbag priced at $2,001 with a resale value of 50% is within the relevant market but an excluded handbag priced at $2,000 with a resale value of 49% is not 'reasonably interchangeable.'"  (MTD 9-10.)

But TRR *does* plausibly allege that hold-value handbags are *not* reasonably interchangeable with more common bags and less classic styles.  TRR alleges that:  (1) when a consumer spends a large amount for a classic handbag, in addition to enjoying the bag, the consumer wants to know if the bag will retain much of its value; (2) consumers who purchase such bags generally understand the resale value and consider that when evaluating purchase price; (3) these consumers plan and research their purchase, including retained value; (4) because a consumer intends to enjoy the bag, a hold-value handbag is not a substitute for other investments,

(5) hold-value handbags are characteristically made of durable material, last longer, and wear better over time; (6) such handbags often conspicuously display logos because bags with such logo branding typically hold value better; and (7) more common bags and less classic styles are not substitutes because they do not retain substantial value. (Countercl. ¶¶ 19-21.)

Further, the parameters of the hold-value market—that it includes luxury bags that sell for over $2,000 and retain 50-100% of their value—are neither "arbitrary" nor "gerrymandered." The *New York Jets* decision is instructive. There, the defendant moved to dismiss on grounds that the plaintiff's definition of the relevant market—*i.e.*, enclosed spectator facilities with capacities greater than 5,000—"arbitrarily disregards venues that hold fewer than 5,000 spectators." 2005 WL 2649330, at *5. The court denied the defendant's motion to dismiss, holding that the "interchangeability of alternative venues is too fact-intensive . . . Further discovery is necessary before this Court can determine whether [defendant] possesses monopoly power in a relevant market." *Id.* Similarly, here, TRR plausibly alleges that handbags above a certain price range and retention range are not interchangeable with handbags that do not hold the same value. Whether an alternative kind of bag—*i.e.*, a "handbag priced at $2,000 with a resale value of 49%" (*see* MTD 10)—is reasonably interchangeable is a fact-intensive an inquiry to be resolved at a later stage. *See also Geneva Pharm. Tech. Corp.* v. *Barr Lab'ys Inc*., 386 F.3d 485 (2d Cir. 2004).[3]

---

[3]   Chanel also argues, in a footnote, that TRR fails to plausibly allege a relevant geographic market defining "the precise geographic boundaries of effective competition." (MTD 11, n.6.)  Chanel argues that TRR's proposed geographic market of the United States "is belied by TRR's admission in its Answer that consumers worldwide seek to purchase Chanel's products." (*Id.*)  The "relevant geographic market is defined simply as the geographic area where competition occurs." *New York Citizens Comm. on Cable TV* v. *Manhattan Cable TV, Inc*., 651 F. Supp. 802, 807 (S.D.N.Y. 1986).  Here, TRR alleges that Chanel sells its products across the United States and that "[f]irst sale Chanel handbags are sold only in Chanel boutiques and select 'authorized' high-end retailers, which are carefully chosen and monitored, throughout the United States." (Countercl. ¶¶ 27, 35.)  Thus, TRR has alleged "a national geographic market based on the area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *In re Keurig*, 383 F. Supp. 3d at 238 (quotations and citations omitted).

**B.    TRR Alleges "Market Power" Supporting Actual and Attempted Monopolization**

In the Second Circuit, a "court will draw an inference" of monopoly power "only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Markets, Inc.* v. *Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998). Those other factors include barriers to entry, the elasticity of consumer demand, and the nature of anticompetitive conduct such as whether there is "exclusionary conduct without the justification of efficiency." *M&M Med. Supplies & Servs., Inc.* v. *Pleasant Valley Hosp. Inc.*, 981 F.2d 160, 168 (4th Cir. 1992); *Tops Markets*, 142 F.3d at 98. This is a "heavily fact-intensive" inquiry. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008); *see also Broadcom Corp.* v. *Qualcomm Inc.*, 501 F.3d 297, 319 (3d Cir. 2007) (whether defendant has "dangerous probability" of monopolization is a "fact-sensitive inquiry, in which market share is simply one factor").[4] Nevertheless, Chanel argues that TRR fails to allege either "indirect evidence" or "direct evidence" that would demonstrate Chanel's monopoly power. (MTD 11-12.) As discussed below, TRR pleads facts demonstrating market power under either approach.

1.    TRR Alleges "Monopoly Power" Demonstrating Actual Monopolization

In its attempt to obscure the fact-intensive nature of this inquiry, Chanel argues that TRR alleges only a 30% market share to support actual monopolization and that "a 30% market share . . . is too low to establish monopoly power as a *matter of law*." (MTD 13 (emphasis added).) Chanel's claims are not true—either as a factual matter or on the law.

As to the facts, TRR alleges that Chanel "commands an *over* 30% share in the Relevant

---

[4] Chanel tries to simplify this analysis by arguing that, under the "indirect" method, courts are required to consider only two factors: market share and barriers to entry. (Chanel Br. 12-13 (citing *Bayer Schering Pharma AG* v. *Sandoz, Inc.*, 813 F. Supp.2d 569, 578-79) (S.D.N.Y. 2011).) But in *Bayer Schering*, the court noted that "barriers of entry" is one of many factors that courts may consider when determining market power. *Id.* at 578-79.

Market for top tier and investment quality handbags and hold-value handbags, with an *above* 30% to 40% share in the submarket for investment grade handbags, and an *above* 35% to 50% share in the submarket for hold-value handbags." (Countercl. ¶ 23 (emphases added).) Thus, TRR alleges that Chanel's market share in the Relevant Markets is *over and above* those ranges.

As to the law, the Second Circuit has expressly rejected Chanel's argument that, *as a matter of law*, market share is determinative of whether a plaintiff has pled either monopolization or attempted monopolization. *See, e.g.*, *Broadway Delivery Corp.* v. *United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981) (a "jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share"). Precisely because assessing monopoly power is a "heavily fact-dependent" inquiry, "courts rarely grant dismissal of Section 2 claims on the basis of insufficient market share, unless the plaintiff rests its claims on market share allegations to the exclusion of other evidence." *In re Payment Card Interchange Fee*, 562 F. Supp. 2d at 401. Taking into account these other factors, "a party may have monopoly power in a particular market, even though its market share is less than 50%." *Hayden Pub. Co.* v. *Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984); *see also Broadway Delivery Corp.*, 651 F.2d at 130.

"Courts in the Second Circuit have permitted findings of market power with shares less than 50%." *New York* v. *Actavis, PLC*, No. 14-cv-7473, 2014 WL 7015198, at *37 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. N.Y. ex rel. Schneiderman* v. *Actavis PLC*, 787 F.3d 638 (2d Cir. 2015).[5] None of Chanel's cases—many of which were decided on summary judgment or on appeal after verdict—is to the contrary. For example, in *Nifty Foods Corp.* v. *Great Atl. & Pac. Tea Co.*, the

---

[5]   *See also United States* v. *Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (affirming finding of market power where one defendant held 47% share and another held 26% share); *Energex Lighting Corp.* v. *N. Am. Philips Lighting Corp.*, No. 83 Civ. 3929 (SWK), 1990 WL 83528, at *3-4 (S.D.N.Y. June 12, 1990) (denying motion to dismiss monopolization and attempted monopolization claims where defendants did not dispute 25% market share when alleged anticompetitive practice occurred); *In re Payment Card Interchange Fee*, 562 F. Supp. 2d at 400 (finding of less than 30% market share does not foreclose possibility that plaintiffs may succeed on their Section 2 claims.).

Second Circuit affirmed summary judgment dismissing the plaintiff's monopolization and attempted monopolization claims. 614 F.2d 832, 841 (2d Cir. 1980). Critical to the Second Circuit's decision was that the defendant's market share was in "rapid and continuous decline" from a high point of 54.5% to 33% five years later, and thus "no reasonable jury could conclude . . . there was a probability that [the defendant] would monopolize the [relevant] market, let alone a dangerous probability." *Id.* Chanel's other cases fare no better and only demonstrate that a plaintiff must plead (and ultimately show) more than market share. For example, *United Air Lines, Inc.* v. *Austin Travel Corp.* is an appeal of a summary judgment dismissal, in which the district court found that the defendant had "introduced literally no relevant admissible specific probative evidence" relating to market power. 867 F.2d 737(2d Cir. 1989); 681 F. Supp. 176, 180 (S.D.N.Y. 1988). And, in *Michael E. Jones, M.D., P.C.* v. *Aetna, Inc.*, the court dismissed a Section 2 claim where the plaintiff alleged only a 33% market share and the complaint was otherwise "bereft of facts indicating whether or how [the defendant's] conduct actually excluded or is likely to exclude competition." No. 19-cv-9683, 2020 U.S. Dist. LEXIS 174440, at *7 (S.D.N.Y. Sept. 23, 2020).[6]

Here, TRR has pled much more than just an above 30% to 50% market share by Chanel in the relevant markets. TRR also alleges that the "barriers to entry" to operate in the relevant markets are high because "discerning luxury consumers place a premium on a trustworthy and established brand" and that it takes "time and significant amounts of money to be able to establish a reputation to earn the trust of luxury consumers," and that Chanel's agreements with publishers and certain

---

[6] Chanel also points to language in *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 106 (2d Cir. 2002), that it claims stands for the proposition that 64% market share is insufficient for a monopoly claim. Chanel misconstrues the ruling. In *PepsiCo*, the Second Circuit observed, in *dictum*, that PepsiCo had not sought to argue that Coca-Cola had monopoly power in a broader fountain syrup market, "nor could it," because the three largest suppliers of fountain syrup accounted for only 50.2% of the market combined, and of those Coca-Cola had a 64% share of that portion of the market—*i.e.*, a 32% market share, *not* 64%. *Id.* at 109. Further, the court indicated that the share could be sufficient with additional evidence, such as an ability to control prices or exclude competition. *Id.* And as to *United States* v. *Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945), the Second Circuit subsequently clarified that the decision was limited to the facts and did not enounce a generalized rule. *See Broadway Delivery Corp.*, 651 F.2d at 127.

retailers have created further barriers of entry that have inhibited the growth of competition and "artificially raised and maintained the price paid by consumers" in the relevant markets. (Countercl. ¶¶ 26, 89, 93.)  TRR also alleges that:  (1) when it perceives its bags becoming too ubiquitous, Chanel limits supply (*id.* ¶¶ 35-37); (2) Chanel has used its monopoly power to cause Neiman Marcus and Saks to end its partnerships with TRR, against their independent economic interests (*id.* ¶¶ 38-49); (3) Chanel has used its monopoly power to cause publishers to cease advertising and marketing negotiations with TRR, against their economic interests (*id.* ¶¶ 50-55); (4) Chanel has asserted in its own advertisements that Chanel goods bought on websites like TRR are "likely to be fake" (*id.* ¶¶ 56-59); (6) Chanel claims that "[o]nly Chanel itself can know what is genuine Chanel" while simultaneously refusing to license its authentication database (*id.* ¶¶ 60-66); and (7) Chanel has tolerated similar conduct by Farfetch, in which it holds a significant investment while pursing litigation against other competitors.  (*id.* ¶¶ 67-71.)

These factors—combined with Chanel's significant market share of *over* 30% to 50% in the investment grade and hold-value handbag markets—state plausible and actionable Section 2 claims.  Chanel has utterly failed to address any of those other factors in its opposition brief.

***Second***, TRR pleads facts that would prove its claims under the so-called "direct" method by demonstrating "that the defendant is literally controlling prices *or* excluding competitors from the relevant market." (MTD. 12 (emphasis added).)  TRR plainly alleges that Chanel limits supply and increases prices as a result of its market power.  (Countercl. ¶¶ 25, 35-37, 49.)  For example, TRR alleges that "Chanel became concerned that its classic flap handbag"—which TRR alleges is an investment grade handbag (*id.* ¶ 12)—"was being carried by too many people 'without style,' so it reduced supply and significantly increased prices in order to maintain the desirability of its brand and therefore, its dominance" in the relevant markets.  (*Id.* ¶ 37.)  TRR also pleads—as

-11-

discussed above—numerous allegations demonstrating Chanel has the ability to and has sought to exclude competitors from the relevant markets—including by creating high barriers to entry for entrants and by blocking TRR's access to brick and mortar retailers.  (*Id.* ¶¶ 26, 38-49, 56-59, 64.)[7] TRR's allegations that Chanel's ability to control prices and restrict supply in the relevant markets—as well as the other factors discussed—demonstrate Chanel's market power.

Chanel attempts to neutralize these allegations by claiming that Chanel has a "*right* under the antitrust laws to make decisions regarding the pricing and distribution of its products."  (MTD 12.)   Chanel's decision making as to the pricing and distribution of first-sale bags is not unconstrained under the antitrust laws—as Chanel's own cases demonstrate.[8]  And, in any event, TRR's allegations concern Chanel's attempts to exclude *resellers* like TRR, rather than any controls that Chanel has sought to implement with respect to its *own* distribution of first-sale bags.

2.  TRR Alleges "Market Power" Demonstrating a "Dangerous Probability" of Chanel Achieving a Monopoly to Support Attempted Monopolization

Chanel argues that TRR's attempted monopolization claim must fail because TRR must (and has failed to) allege that "(1) Chanel has a sufficiently high market share in the relevant market <u>and</u> (2) other competitors or potential competitors are unlikely to successfully compete against Chanel."  (MTD 19 (citing *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999)).  Yet again, Chanel misconstrues the standard and the case law.

For example, in *AD/SAT, Div. of Skylight*, on appeal of a summary judgment decision, the

---

[7]   Chanel argues that "power to exclude competition" means "power to *actually remove* a firm from the market." (MTD 13 (emphasis added) (citing *All Star Carts & Vehicles, Inc.* v. *BFI Can. Income Fund.*, 887 F. Supp. 2d 448, 458 (E.D.N.Y. 2012)).)  But *All Star* says no such thing and that is not the law.  It is basic hornbook law that the ability to "exclude competition" includes barriers to entry and expansion.  *See* Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501 (2020).  Thus, TRR's growth does not undermine the antitrust counterclaims.  As TRR alleges, Chanel has created barriers to entry and blocked TRR's expansion into brick-and-mortar retail, among other things.

[8]   *See, e.g.*, *Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  Further, *Bayer Schera Pharma AG* v. *Sandoz, Inc.*, involves a "natural monopoly" in a single-brand market, which is not alleged here.  No. 08 CIV.03710 (PGG) 2010 WL 1222012, at *6 n.10 (S.D.N.Y. Mar. 29, 2010).

Second Circuit explained that "Once the relevant market is determined, *we consider a variety of factors in addition to the defendant's market share, including the strength of competition, barriers to entry, and the probable development of the market* . . . in order to determine whether there is a dangerous probability that, left unchecked, the defendant will attain monopoly power. . . ."  181 F.3d at 226-27 (emphasis added).  As with actual monopolization, the market power inquiry for an attempted monopolization claim is highly fact intensive.  *Supra* 8.

As discussed above, TRR *has* alleged such factors in addition to market share.  *Supra* 11. And, as to market share, courts recognize that attempted monopolization claims can succeed with even lower market shares than for actual monopolization.  Case law in this Circuit and across the country is replete with examples of plaintiffs adequately pleading attempted monopolization against defendants with 30% to 50% market shares.  *See, e.g.*, *Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 872 F. Supp. 52, 64 (S.D.N.Y. 1994) (denying motion to dismiss attempted monopolization claim where market share was alleged to be 39% to 52%); *Optronic Techs., Inc.* v. *Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370 (EJD), 2020 WL 1667435, at *7 (N.D. Cal. Apr. 3, 2020) (jury could find dangerous probability of achieving monopoly power where market share ranged from 33% to over 63%); *M&M Med. Supplies & Serv., Inc.*, 981 F.2d at 168.

None of Chanel's cases supports dismissal of TRR's attempted monopolization counterclaim.  Chanel cites *Twin Labs., Inc.* v. *Weider Health & Fitness*, in which the Second Circuit affirmed summary judgment dismissing an attempted monopolization claim against a defendant who "at best had 25% of the relevant market and probably much closer to 10%."  900 F.2d 566, 570 (2d Cir. 1990).  In dismissing the claim, the Second Circuit still considered *other* factors, noting that market share is not the "sole" indicator of the existence of a dangerous probability of success.  *Id.*  Chanel also cites *Natsource LLC* v. *GFI Grp., Inc.* for the proposition

-13-

that an "attempted monopolization claim failed where plaintiff failed to plausibly allege low strength of competition in the relevant market." 332 F. Supp. 2d 626, 635-37 (S.D.N.Y. 2004). But Chanel misconstrues the court's actual holding:  the court *denied* a motion to dismiss an attempted monopolization claim because the plaintiff alleged, in addition to market share, tortious interference with contracts and business relationships.  *Id.* at 631.  The court granted the defendant's motion for summary judgment, noting that the plaintiff "relied solely on the allegations of the complaint" and failed to controvert the Rule 56.1 statement.  *Id.* at 632-33.[9]

Chanel also cites to *Twin Labs* for the proposition that the "probability of success is reduced" where "the remainder of the market is divided among dozens of competitors."  (MTD 20.)  Again, *Twin Labs* is a summary judgment decision and demonstrates that fact questions regarding the number and identity of Chanel's competitors are better resolved at a later stage.[10] On a motion to dismiss, the Court must accept TRR's allegations as true.  *Iqbal*, 556 U.S. at 678. Nowhere does TRR allege that Chanel faces dozens of competitors; rather TRR alleges that Chanel dominates the relevant markets, perceives TRR (and other secondary resellers) as a threat, and has acted to eliminate this perceived threat.  (Countercl. ¶¶ 1-2, 28-32, 34, 72-74.)

   3.   <u>TRR Alleges that Chanel Alone Has Monopolized and Attempted to Monopolize the Relevant Markets</u>

Chanel also claims that TRR alleges a "joint" or "shared" monopoly dominated by the "Holy Trinity" and in which Hermes is the dominant actor.  (MTD 8.)  TRR alleges no such thing

---

[9]   Chanel also cites *Six W. Retail Acquisition, Inc.* v. *Sony Theatre Mgmt. Corp.*—also decided on summary judgment—for the proposition that a 53% market share is not sufficient to support a dangerous probability "as a matter of law."  No. 97-cv-5499, 2004 U.S. Dist. LEXIS 5411, at *37-38 (S.D.N.Y. Mar. 31, 2004).  Again, Chanel misconstrues this decision.  There, the court held that with respect to the defendant's rise in market share from 23% to 53%, "*this fact alone* does not create a dangerous probability of monopolization."  *Id.* at *37 (emphasis added).

[10]   Chanel's other case—*Foam Supplies, Inc.* v. *The Dow Chemical Co.*, No. 05-CV-1772 (CDP), 2007 WL 4210354 (E.D. Mo. Nov. 27, 2007)—also considered claims for monopolization and attempted monopolization at the summary judgment stage.  And in *Bayer Schering*, the court noted that the plaintiff had actually *alleged* that the market is "dominated by a small number of large producers," and that that fact did not support a showing of the dangerous probability of monopolization.  813 F. Supp.2d at 580.

anywhere in its counterclaims.  (*See, e.g.*, Countercl. ¶¶ 96-101.)  Although TRR alleges that the relevant market for top tier investment grade handbags and hold-value handbags largely consist of *specific bags* from Chanel, Hermes, and Louis Vuitton, TRR alleges that *Chanel alone* has monopolized and attempted to monopolize the relevant markets for the sale of top tier investment grade and hold-value handbags. (*Id.* ¶¶ 12, 18, 96-101.)

The two cases Chanel cites are inapposite.  In *H.L. Hayden Co. of N.Y.* v. *Siemens Med. Sys., Inc.*, the plaintiffs pleaded attempted monopolization by two separate entities. 879 F.2d 1005, 1017 (2d Cir. 1989).  The Second Circuit held that "the district court correctly concluded that the market shares of [the two entities] could not be aggregated to establish an attempt to monopolize . . ." *Id.* at 1018.  Similarly, in *In re Zinc Antitrust Litig.*, the plaintiffs alleged multiple defendants *collectively* sought to dominate the market. 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016).  By contrast, TRR alleges that *Chanel*—a single entity—commands an over 30-50% market share in the relevant markets, and that *Chanel alone* has monopolized and attempted to monopolize the relevant markets.  Nowhere does TRR aggregate Chanel's alleged market share with any other entity, nor does TRR plead that any other entity is a monopolist in the relevant markets.

### C.   TRR Alleges that Chanel Engaged in Anticompetitive Conduct Aimed at Excluding Competition

Chanel claims that TRR fails to allege any anticompetitive conduct undertaken to exclude competition.  In making this argument, Chanel ignores most of TRR's allegations and tries to explain away the rest as permissible conduct.[11]  None of Chanel's arguments have any merit.

*First*, Chanel argues that TRR's allegations regarding Chanel's illegal agreements with retailers are non-actionable because "suppliers . . . are generally permitted to control how their

---

[11]   Chanel ignores and omits any discussion of TRR's allegations that Chanel limits supply to prevent its bags from becoming too ubiquitous and that Chanel misrepresents authentication by falsely claiming that only Chanel can authenticate Chanel while refusing to license its authentication database.

products are sold[.]" (MTD 15.)  But TRR's allegations do not concern sales restrictions by Chanel on *its* first-sale products.[12]  Rather, TRR alleges that Chanel demanded that Neiman Marcus and Saks amend its partnership with TRR such that (1) no consignor could consign a second-hand Chanel product at their stores (regardless of where the product was originally purchased) and (2) no consignor who received a gift card from the retailer through consignment with TRR could use it on a Chanel product.  (Countercl. ¶¶ 42,  45.)  These allegations concern restraints by Chanel on a secondary reseller—*not* on first-sale items distributed by Chanel to retailers.

  ***Second***, Chanel argues that TRR's allegations concerning Chanel's demands to advertisers merely allege "parallel conduct" and that TRR's allegation that an "unidentified 'huge partner' of WWD was responsible for blocking TRR's advertisement does not suffice" under *Twombly*. (MTD 16.)  TRR does not merely allege parallel conduct.  TRR alleges specific demands that Chanel made to Neiman Marcus and Saks in the fall of 2015.  (*See* Countercl. ¶¶ 42, 44-45.)  TRR also alleges that *around that same time*—in late 2015 or early 2016—four publishers ended advertising discussions with TRR.  (*Id.* ¶¶ 50-51.)  Later, in 2019, WWD told TRR that it could not run TRR's advertisements due to a conflict with a "huge partner."  (*Id.* ¶ 53.)  As TRR alleges, it was against each publisher's economic self-interest to turn down advertising from TRR.  (*Id.* ¶ 51.)  *E.g.*, *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (district court erred in granting motion to dismiss where plaintiffs alleged conduct contravening self-interest).

  ***Third***, Chanel argues that the Court should disregard TRR's allegations concerning

---

[12]  The cases cited by Chanel for this point are inapposite.  (MTD 15-16 (citing *Tese-Milner* v. *Diamond Trading Co.*, No. 04 cv 5203, 2014 U.S. Dist. LEXIS 1046, at *8 (S.D.N.Y. Jan. 6, 2014); *Fuchs Sugars & Syrups, Inc.* v. *Amstar Corp.*, 602 F.2d 1025, 1030 (2d Cir. 1979); *Trans Sport, Inc.* v. *Starter Sportswear, Inc.*, 775 F. Supp. 536, 543 (N.D.N.Y. 1991).)  Chanel's "sole-sourcing" case is similarly inapposite and involves public safety concerns not applicable here.  In *Eveready Wholesale Drugs, Ltd.* v. *Pfizer, Inc.*, the court dismissed, on summary judgment, antitrust claims that arose from a manufacturer's restricting a wholesaler to purchasing its pharmaceutical drugs from authorized distributors.  No. 04-cv-6590, 2006 U.S. Dist. LEXIS 36677, at *3-4 (S.D.N.Y. June 5, 2006).  Central to the court's decision was that the plaintiff failed to show that competition was harmed by the policy and the purpose of these restrictions was to mitigate risks to "public health and safety." *Id.* at *4-5.

Chanel's false statements that Chanel items sold on "unauthorized websites are likely to be fake" because the statements are true and otherwise non-actionable. (MTD 16; Countercl. ¶¶ 57-58, 75.) But as Chanel's own cases recognize, "disparagement coupled with the power to exclude competition may be illegal under the Sherman Act." *U.S. Football League* v. *Nat'l Football League*, 634 F. Supp. 1155, 1183 (S.D.N.Y. 1986). Similarly, disparagement accompanied by misstatements of fact may amount to a violation of the federal antitrust laws. *Id.*

The Court should give no weight to Chanel's claim that the statement is true; whether it is true is a question of fact. Relatedly, there is no merit to the argument that this statement is non-actionable as it does not explicitly reference TRR or secondary resellers. (MTD 16.) The import is clear. Chanel also claims that TRR cannot overcome the presumption of a *de minimis* effect on competition. (*Id.* 17.) Although a plaintiff claiming monopolization based on disparagement may be required to ultimately overcome such a presumption, that is a fact-based inquiry properly considered on summary judgment. *See, e.g.*, *Nat'l Ass'n of Pharm. Mfrs., Inc.* v. *Ayerst Labs., Div. & Am. Home Prod. Corp.*, 850 F.2d 904, 916-17 (2d Cir. 1988) (claim improperly dismissed on motion to dismiss, prior to discovery); *In re Keurig*, 383 F. Supp. 3d at 241 (plaintiffs entitled to discovery on monopolization based on false and misleading statements).[13]

Chanel also argues, in a footnote, that Chanel's conduct and statements made in this litigation—such as that only Chanel can authenticate Chanel—are not actionable under the *Noerr-Pennington* doctrine. (MTD 17 n.7.) But TRR does not allege that Chanel instituted a "sham"

---

[13] Chanel's cases are not to the contrary. For example, *Reed Constr. Data Inc.* v. *McGraw-Hill Cos.*, was decided on summary judgment and emphasizes the fact-intensive inquiry for rebutting the *de minimis* presumption. 49 F. Supp. 3d 385, 419 (S.D.N.Y. 2014). Also, although Chanel claims that *Reed* holds that a claimant *must* ultimately satisfy each prong of a six-factor test to rebut the *de minimis* presumption, *Reed* actually indicates that not every factor must be satisfied in the Second Circuit. And in *Affinity LLC* v. *GfK Mediamark Research & Intelligence, LLC*, the plaintiffs had not alleged any facts that could overcome the presumption. 547 F. App'x 54, 56-57 (2d Cir. 2013). That is simply not the case here. (*See* Countercl. ¶¶ 56-59.)

lawsuit under the *Noerr-Pennington* doctrine such that the filing of the lawsuit provides an *independent basis* for a claim.[14]   Rather, these statements in litigation are admissions of what Chanel maintains in the marketplace to be true.  They are also "probative of . . . intent, or of the 'purpose and character' of the [party's] anticompetitive conduct."  *U.S. Football League*, 634 F. Supp. at 1183-84.  In any event, TRR alleges Chanel made similar claims in a 2017 meeting— prior to the initiation of any litigation.  (Countercl. ¶ 61.)

   ***Fourth***, Chanel argues that its actions concerning Farfetch cannot constitute exclusionary conduct because a manufacturer is free to choose which parties with whom it will deal.  (MTD 17.)  Again, Chanel misses the point.  TRR does not allege that Chanel's partnership with Farfetch is in itself anticompetitive; rather, TRR alleges that Chanel has tolerated conduct similar to that for which it is suing other resellers by a company in which it has a "significant investment." (Countercl. ¶¶ 67-71.)  This fact is probative of Chanel's intent and purpose in pursuing its anticompetitive conduct.  Chanel's cases do not suggest otherwise.[15]

### D.   TRR Alleges that Chanel Has Injured Market-Wide Competition

   Chanel claims that TRR fails to allege any harm to competition "as a whole" in the relevant market and not just to TRR.  (MTD 18.)  But Chanel ignores numerous allegations asserting injury to competition itself.  TRR alleges that the barriers to entry in the relevant markets are high, that Chanel limits supply to prevent its bags from becoming too ubiquitous, that Chanel's conduct has "inhibited the growth and development of competitors," and that the harmful effects of Chanel's

---

[14]   TRR reserves all of its rights if discovery yields evidence that Chanel did, in fact, institute "sham" litigation.

[15]   In *Florida Seed Co.* v. *Monsanto Co.*, the court considered termination of a distributorship in the post-merger context; the court held "[t]he teaching of [the case law] is clear: distributors who are terminated following a merger suffer no antitrust injury."  105 F.3d 1372, 1375 (11th Cir. 1997).  And in *Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*, the court similarly considered a situation unlike that at issue here.  At issue in that Sherman Act decision was a telephone company's "duty under the [Telecommunications Act of 1996] to share its network with competitors." 540 U.S. 398, 401 (2004).  Those cases are not factually analogous to this one.

price increases and other monopolistic conduct injures "*resellers*" of Chanel bags.  (Countercl. ¶¶ 24-26, 33, 35-37 89, 93; *see also* ¶¶ 73, 100 (Chanel's exclusionary scheme harmed *competition* in the Relevant Markets by reducing supply, providing fewer options for consumers, limiting "innovation from the entry and growth of competitors," and creating supracompetitive prices for consumers).[16]  Thus, contrary to Chanel's assertions otherwise, TRR alleges injury to competition itself and not simply conduct that is "to the detriment of a single competitor."  (MTD 19.)[17]

### E.    TRR Alleges that Chanel Has a "Specific Intent" to Monopolize the Relevant Markets

Chanel argues that TRR fails to plausibly allege "specific intent" by Chanel to monopolize the Relevant Markets.  Yet again, Chanel ignores most of the relevant allegations in TRR's counterclaims.  (*See, e.g.*, Countercl. ¶ 49 ("Chanel's conduct . . . was intended to maintain Chanel's market power and otherwise enable Chanel to continue to increase prices and reduce output of investment grade and hold-value handbags."); *id.* ¶ 24 ("Chanel has further engaged in this scheme with the anticompetitive intent of pushing out resellers of Chanel handbags and increasing its own market dominance."); *see also id.* ¶¶ 2, 54, 64, 86, 90, 94.)  Thus, TRR's counterclaims are nothing like the pleadings in the cases cited by Chanel.[18]  TRR has alleged that

---

[16]   (*See also* Countercl. ¶ 58 (false statements that bags purchased online are "likely fake" has "significant impact on *resale competitors*"); ¶ 59 (Chanel engaged in "third-party opposition campaign against TRR and *other resale competitors*" to generate negative stories); ¶ 62 (Chanel sought to limit authentication by "TRR and *others in the industry*"); ¶ 64 (Chanel's representations that its internal database "is the only reliable source for authentication information and then restricting access to that database" is part of attempt to "drive out its competitors *who are secondary resellers*").)

[17]   The alleged injury harms other competitors as well.  For instance, Chanel's war on resellers has led to a lawsuit against another luxury reseller, What Goes Around Comes Around.  *See Chanel* v. *WGACA LLC*, No. 18-cv-2253 (LLS).  *See also* ECF No. 90 (attaching unsealed documents concerning internal Chanel presentations and email correspondence about the secondary retailer "threat" to Chanel's business).

[18]   *See, e.g.*, *In re Zinc Antitrust Litigation*, 155 F. Supp. 3d at 381-82 (granting leave to amend to fix pleading deficiencies where plaintiff alleged that defendant specifically intended to obtain a monopoly over a *different* market than the one for which injury was alleged); *Falstaff Brewing Co.* v. *Stroh Brewery Co.*, 628 F. Supp. 822, 829 (N.D. Cal. 1986) (specific intent not adequately alleged where intent was to "eliminate *plaintiff* companies"); *Mb Sportswear* v. *Vf Outdoor*, 2007 U.S. Dist. LEXIS 118397 (S.D.N.Y. Apr. 13, 2007) (granting leave to amend to fix pleading deficiencies where plaintiffs alleged defendants acted with "intent to injury the Plaintiffs or to destroy their business" rather than to monopolize the market).

Chanel had a "specific intent" to monopolize the relevant markets.

## II.     TRR's Counterclaims State Plausible Antitrust Claims under Section 1 of the Sherman Act and the Donnelly Act

In arguing for dismissal of TRR's Section 1 counterclaim, Chanel fundamentally mischaracterizes TRR's factual allegations and theory of liability.  Chanel attempts to characterize this claim as a vast hub-and-spoke conspiracy between and among all of Chanel, Neiman Marcus, Saks, and four separate publishers.  (MTD 22-23.)  But TRR alleges no such thing; TRR alleges that *Chanel* entered into a series of illegal vertical agreements with each of those other entities. (Countercl. ¶¶ 38-55.)

Section 1 of the Sherman Act prohibits "every contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Courts across the country have held that this section prohibits vertical agreements that unreasonably restrain trade.  *E.g.*, *In re Keurig*, 383 F. Supp. 3d at 245-46; *Am. Needle, Inc.* v. *Nat'l Football League*, 560 U.S. 183, 186 (2010) (holding that certain licensing activities constituted concerted action not categorically beyond the coverage of Section 1 and indicating that the legality of such action must be judged under the Rule of Reason).

For instance, in *In re Keurig*, the Court denied a motion to dismiss where plaintiff cup manufacturers alleged that a defendant cup manufacturer had restrained competition by (1) "conspiring with roasters and coffee brands to enter into anticompetitive agreements to refuse to deal" with the plaintiffs and (2) "coercing distributors and retailers to enter into  anticompetitive agreements to refuse to deal" with the plaintiffs.  383 F. Supp. 3d at 245.  The Court also denied dismissal of a Section 1 claim asserted by a separate group of plaintiffs who alleged that the defendant had "secured a network of agreements from licensees" not to deal with those plaintiffs. *Id.* at 245-246.  The Court held that such allegations of a vertical refusal to deal—*i.e.*, a network

-20-

of independent vertical agreements by the defendant—stated a plausible Section 1 claim, even in the absence of any horizontal restraints.  *Id.*  As in *Keurig*, TRR states a plausible Section 1 claim by alleging a series of illegal vertical agreements by Chanel with retailers and publishers.

Chanel argues that TRR's allegations are "conclusory" and fail to demonstrate that Chanel "ever coordinated" with the retailers or publishers.  (MTD 22-23.)  But TRR alleges detailed and specific facts demonstrating an agreement between Chanel and each of the named retailers and publishers.  TRR alleges that, in fall 2015, Neiman Marcus's Chief Marketing Officer *told TRR that Chanel threatened to pull all of its products from Neiman Marcus stores unless Neiman Marcus made immediate changes to its partnership with TRR*.  (Countercl. ¶ 42.)  TRR also alleges that *around that same time*—in late 2015 or early 2016—*The New York Times*, *New York Magazine*, and *Vogue* ended advertising discussions with TRR, against their economic interest.  (*Id.* ¶¶ 50-51.)  And TRR alleges that, in 2019, WWD told TRR that it could not run TRR's advertisements due to a conflict with one of its "huge partners."  (*Id.* ¶ 53.)  The import of that comment was clear:  Chanel used its influence to block WWD from running TRR's ads.

Chanel also attacks TRR's Section 1 claim as implausible claiming that it does not "make economic sense" and noting that TRR alleges each individual retailer and publisher acted against its apparent economic self-interest in turning down business opportunities with TRR.  (MTD 23.)[19]  The fact that each individual retailer and publisher acted against its apparent economic self-interest—*i.e.*, acted anticompetitively—*supports* the inference of an illegal agreement with

---

[19]   Chanel relies on *In re Currency Conversion Fee Antitrust Litigation* for this proposition, but the court there *denied* a defendant's motion for summary judgment because there were issues of fact as to whether the alleged conspiracy was "economically senseless."  773 F. Supp. 2d 351, 371-72 (S.D.N.Y. 2011).  Nor does *AD/SAT, a Div. of Skylight, Inc.* v. *Associated Press*, save Chanel's argument.  920 F. Supp. 1287 (S.D.N.Y. 1996).  In *AD/SAT*, the court dismissed a Section 1 claim *on summary judgment*, because it found that there was *no express agreement*, and a conspiracy with smaller market participants "would be unlikely to produce the desired results" without the participation of larger participants.  *Id.* at 1310.  Here, TRR alleges agreements with major publications and retailers.

Chanel.  *See, e.g.*, *Starr*, 592 F.3d at 325.  Indeed, the retailers' and publishers' actions would not

"make economic sense" absent Chanel's restraint on competition; they were given an economic

ultimatum forcing them to choose between TRR and Chanel.  (*See* Countercl. ¶ 42, 46, 51, 53.)

### III.    TRR States Plausible Tortious Interference Claims

#### A.    TRR Plausibly Alleges That Chanel Tortiously Interfered with TRR's Contracts with Retailers

 "To state a claim for tortious interference under New York law, a plaintiff must allege "(1)

the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of

the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render

performance impossible; and (4) damages to plaintiff."  *New Paradigm Software Corp.* v. *New*

*Era of Networks, Inc*., 107 F. Supp. 2d 325, 330 (S.D.N.Y. 2000).  TRR does exactly that.

*First*, TRR alleges that it had "valid and enforceable contracts" with Neiman Marcus and

Saks to issue "gift cards to consignors in lieu of cash consignment commissions."  (Countercl. ¶¶

110, 116.)  *Second*, TRR alleges that Chanel had knowledge of those contracts, and, *third*, that

Chanel intentionally interfered and induced the retailers to break those contracts.  (*See id.* ¶¶ 42-

45.)  *Fourth*, TRR alleges damages as a result of Chanel's interference.  (*See, e.g.*, *id.* ¶ 47 ("The

loss of these partnerships significantly inhibited TRR's business development and growth"); *id.* ¶¶

115, 121 (TRR suffered "lost profits" and a "loss of goodwill and future profits").  TRR's specific

allegations bear no resemblance to the conclusory allegations in Chanel's cases.[20]

---

[20]  For instance, in *Washington Ave. Assocs., Inc.* v. *Euclid Equip., Inc*., the court held that plaintiff did not adequately allege interference with contractual relations because "plaintiff merely asserted that appellant had conversations with defendant which caused defendant to breach lease agreement."  229 A.D.2d 486 (2d Dep't 1996).  Unlike TRR, the plaintiff there did not plead *any other facts* in support of its tortious interference claim.  Chanel's other case, *RSM Prod. Corp.* v. *Fridman*, is also distinguishable.  643 F. Supp. 2d 382 (S.D.N.Y. 2009).  There, the court held that the plaintiff failed to allege that defendants had intentionally procured the country of Grenada's breach of an agreement with the plaintiff.  *Id.* at 406.  Central to the court's holding was plaintiff's failure to allege that any individual defendant acted as an agent of the defendant corporate entity in procuring the purported breach.  *Id.*  By contrast, TRR alleges that *Chanel* directly interfered with TRR's contracts.

Chanel also argues that TRR's claims "must be dismissed because there are no factual allegations specifying when or how Chanel demanded that Neiman Marcus or Saks terminate their relationships with TRR."  (MTD 24-25.)  But that is information that *Chanel* has in its possession; this is not information that TRR could know without discovery.[21]  Ultimately, Chanel is seeking to litigate fact issues on its motion to dismiss.  But whether or not TRR "can be successful on the claim, either on summary judgment or after trial, is not at issue here*."  Italian & French Wine Co. of Buffalo* v. *Negociants U.S.A., Inc.*, 842 F. Supp. 693, 701 (W.D.N.Y. 1993).

### B.  TRR Plausibly Alleges That Chanel Tortiously Interfered with TRR's Prospective Business Relationships with Publishers

Chanel's argument that "TRR's conclusory allegations that Chanel interfered with TRR's business relations with *The New York Times*, *New York Magazine*, *Vogue*, and *WWD* are conclusory and not supported by sufficient allegations of fact" is incorrect.  (MTD 25.)  To state a claim for tortious interference with business relations under New York law, "four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship."  *Scutti Enterprises, L.L.C.* v. *Park Place Entertainment Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).  TRR has established each of these elements with respect to Chanel's conduct with each of the publishers.

Specifically, TRR alleges that it had business relations with each of those four publications, that Chanel interfered with those business relations, that Chanel did so for the purpose of sustaining Chanel's market power, and that TRR was harmed by lost revenue and reduced exposure of its brand in the most important print and digital publications.  (Countercl. ¶¶ 50-55.)  For instance, TRR alleges that in late 2015 or early 2016, "TRR was in discussions with New York Magazine

---

[21]   Indeed, after TRR sought leave to amend to file its counterclaims, Chanel produced relevant materials.

about a digital and print media campaign" when Chanel used its dominance as the most powerful luxury brand to force New York Magazine into an agreement not to deal with TRR, and that it engaged in similar activities with Vogue and The New York Times. (*Id.* ¶¶ 50-51.) The sudden end to these advertising negotiations occurred around the same time as Chanel's interference with Neiman Marcus and Saks. (*Id.* ¶¶ 39, 42, 45, 50-52.) TRR also alleges that, in 2019, TRR was "set" to "run an advertisement" in WWD "promoting [] [TRR's] recent landmark partnership with luxury brand Burberry," and that the advertisement was canceled by WWD at the behest of a "huge partner." (*Id.* ¶ 53.) Clearly, in the context of Chanel's similar conduct with other retailers and publishers, that "huge partner" was Chanel.

These facts are sufficient to demonstrate the causation necessary to state a tortious interference claim. *See Reading Intern., Inc.* v. *Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) (allegations that defendants "illegally pressured distributors to refuse to license" to plaintiff and that "but for the power of" defendants, "it clearly would be in the distributor['s] [] interests to license" were sufficient to allege but for causation). As the court in *Reading Intern.* held: "[i]t would be unreasonable to require more specific pleadings [on causation] prior to discovery." *Id.*

## IV.    TRR's Counterclaims Are Timely

Chanel argues that all of TRR's counterclaims are time-barred because they arise from acts and occurrences in 2015 and 2016. Chanel's argument fails for three separate reasons.

***First***, TRR alleges independent antitrust violations that clearly fall within the four-year statute of limitations under the Sherman Act and Donnelly Act. ***Second***, and relatedly, those independent violations also serve as "overt acts" that restart the statute of limitations for antitrust claims under the "continuing violation" doctrine. Under the continuing violation doctrine for antitrust claims, each time a plaintiff is injured by an overt act of a defendant, a cause of action

accrues and the statute of limitations runs from the commission of that overt act.[22]  *See Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  An overt act will establish a continuing antitrust violation   if "(1) it [is] a new and independent act that is not merely a reaffirmation of a previous act; and (2) it . . . inflict[s] new and accumulating injury on the plaintiff."  *Rite Aid Corp.* v. *Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 268 (E.D.N.Y. 2010) (Sherman Act claims were not barred as a result of continuing violation doctrine).

TRR alleges significant anticompetitive conduct by Chanel, within the past four years, which constitute both independent antitrust violations and "overt" acts.  Those allegations include, *inter alia*, that Chanel (1) has asserted, *from 2018 onward*, that "[o]nly Chanel itself can know what is genuine Chanel" while refusing to license the authentication database that is purportedly required to authenticate Chanel items; (2) falsely represents to consumers*, to this day*, that Chanel handbags purchased from resellers (like TRR) are "likely to be fake"; (3) conspired and agreed with WWD *in 2019* to block advertisements by TRR; (4) limited supply and raised prices when it perceived its bags as becoming too ubiquitous, *in recent years and to this day*; (5) tolerated similar conduct by Farfetch, *in 2018 and to this day*.  (Countercl. ¶¶ 2, 35-37, 53, 56-59, 60-71.)

Each of these allegations is *within* the statute of limitations, and each independently states antitrust causes of action.  These allegations also describe "overt acts" within the continuing violation doctrine.   Each of these subsequent acts inflicted new and accumulating injury on TRR.  As such, TRR has alleged a continuing violation of the antitrust laws.  *See Philip Morris Inc.* v. *Heinrich*, No. 95 CIV. 0328 (LMM), 1996 WL 363156, at *10 (S.D.N.Y. June 25, 1996) (denying

---

[22]   Although Chanel appears to only discuss the continuing violation in connection with TRR's Section 1 claim, the continuing violation doctrine applies equally to Section 2 and Donnelly Act claims.  *See, e.g.*, *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 418, 502 n.15 (1968) (pre-limitations anticompetitive conduct from 1912 could support a Section 2 monopolization claim in 1955); *Simon-Whelan* v. *Andy Warhol Found. for the Visual Arts, Inc.*, No. 07 CIV. 6423(LTS), 2009 WL 1457177, at *7-8 (S.D.N.Y. May 26, 2009) (applying to Donnelly Act claims).

motion to dismiss antitrust claims involving big rigging scheme that began in the early 1980s through 1991 on ground that plaintiff had pleaded a continuing violation).[23]

*Third*, because all of TRR's counterclaims are compulsory under Rule 13, the statutes of limitations were tolled by Chanel's filing of its complaint on November 14, 2018. *See Gary Friedrich Enterprises, LLC* v. *Marvel Enterprises, Inc.*, 08 Civ. 1533(BSJ)(JCF), 2011 WL 13262163 (S.D.N.Y. May 4, 2011) ("filing [] an action tolls the limitations period for compulsory counterclaims").[24] Thus, all of TRR's counterclaims are timely.

Rule 13 defines a compulsory counterclaim as "any claim that . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). "In interpreting Rule 13(a), 'this Circuit generally has taken a broad view, not requiring an absolute identity of factual backgrounds[,] but only a logical relationship between them.'" *Skyline Steel, LLC* v. *Pilepro, LLC*, No. 13-CV-8171, 2015 WL 999981 (S.D.N.Y. 2015) (quotation and citation omitted). The question "is whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Four Seasons Solar Products Corp.* v. *Sun System*, 101 F.R.D. 292, 295 (E.D.N.Y. 1983) (quotations and citation omitted). TRR's tortious interference claims satisfy this "logical relationship" test.

Courts in this circuit have held that counterclaims for tortious interference in connection with anticompetitive conduct are compulsory in trademark and copyright infringement actions

---

[23]  Chanel relies on *Ulrich* v. *Moody's Corp.*, but that is nothing like the case here. There, the magistrate judge recommended dismissal on statute of limitations grounds because the plaintiff alleged "*no* overt acts . . . that could possibly be construed as continuing violations of the antitrust laws." No. 13-cv-0008, 2014 WL 12776746, at *29 (S.D.N.Y. Mar. 31, 2014). The district court adopted the recommendation of dismissal—but on different grounds and explicitly did not consider the statute of limitations. 2014 WL 4977562, at *18 n.14 (Sept. 30, 2014) (Broderick, J.).

[24]  Because the basis for this Court's jurisdiction is federal question under 28 U.S.C. § 1331, this rule applies to both TRR's federal and state law counterclaims. *See Andre* v. *Schenectady Cty.*, No. 95-CV-573, 1997 WL 135910, *1-3 (N.D.N.Y. Mar. 13, 1997) (filing of § 1983 claim tolled statute of limitations for compulsory state claims).

where the initial lawsuit and the alleged "interference is claimed to be part of plaintiff's overall scheme to monopolize."  *See id* at 294-95; *see also United Artists Corp.* v. *Masterpiece Prods., Inc.*, 221 F.2d 213, 216 (2d Cir. 1955).

As in these cases, Chanel's counterfeiting and false advertising claims and TRR's tortious interference and antitrust counterclaims are logically related because they all arise from Chanel's anticompetitive conduct related to its alleged exclusive ability to authenticate and sell Chanel goods.[25]  Chanel's claims are predicated on its belief that TRR's business is fundamentally illegitimate because only Chanel can authenticate Chanel handbags since "[o]nly Chanel itself can know what is genuine Chanel," and thus TRR's use of Chanel's trademark and sale of Chanel goods is unlawful.  (*See* Am. Compl. ¶ 2-7, 34-36.)  This is the same motivation for Chanel's anticompetitive conduct—including Chanel's insistence that secondary resellers cannot authenticate Chanel items, while refusing to license its authentication database; Chanel's false statements that purchases from "unauthorized" websites are "likely to be fake"; Chanel's interference with TRR's contracts and prospective business relationships; and Chanel's tolerance of similar conduct by Farfetch, in which it holds significant investment, while pursuing litigation against others.  (*See, e.g.*, Countercl. ¶¶ 48-55, 61, 67-71.)  And, as discussed *infra*, many of these allegations support TRR's unclean hands defense against Chanel's claims.  Chanel's claims and TRR's counterclaims clearly share significant factual overlap.  Accordingly, TRR's counterclaims are compulsory and the statute of limitations is tolled from the date of Chanel's complaint.[26]

---

[25]  The facts here are nothing like the "factually remote" scenario in the case that Chanel relies on. There, in *Gucci Am., Inc.* v. *Exclusive Imports Int'l*, the parties agreed that a proposed antitrust counterclaim was permissive and could be filed as a separate action.  No. 99 Civ.11490 (RCC)(FM), 2001 WL 21253, at *6 (S.D.N.Y. Jan. 9, 2001).

[26]  In addition, under Rule 15(c), an amendment to a pleading (like here) relates back to the date of the original pleading where the amendment asserts a claim or defense that "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

**V.    The Court Should Deny Chanel's Motion to Strike TRR's Unclean Hands Affirmative Defense**

Chanel's motion to strike fails for two reasons.  ***First***, Chanel's motion to strike is untimely. Chanel, however, argues that it should be relieved of the Rule 12(f) requirement that a party move to strike "within 21 days after being served" because TRR's affirmative defense, as pled, provided Chanel with "no indication as to how the doctrine of unclean hands would bar [its] claims."  (MTD 26-27.)  But Chanel has been on notice of the basis for TRR's defense *for years*.[27]

For years, in numerous briefings, TRR has argued that one of TRR's defenses to this lawsuit would be based on Chanel's anticompetitive conduct aimed at quashing the secondary market for Chanel handbags.  (*See, e.g.*, ECF No. 17 at 1-2, 16; ECF No. 30 at 14, 25; ECF No. 34 at 1.)  And there certainly could have been no doubt as to TRR's theory by June 12, 2020.  That was the date that TRR and Chanel filed a *joint* letter stating TRR's position that "Chanel has unclean hands by virtue of its anticompetitive schemes against the secondary market."  (ECF No. 47 at 3.)  TRR also served numerous document requests—such as requests seeking documents concerning Chanel's partnership with Farfetch, Chanel's actions concerning the secondary market, and Chanel's desire to prevent TRR from selling pre-owned Chanel goods—and explicitly explained to TRR that these requests were "directly relevant to TRR's unclean hands defense." (*See* ECF No. 110-2 at 7, 9.)

Chanel's cases are inapposite.  For example, in *Obabueki* v. *Int'l Bus. Machines Corp.*, the plaintiff had no indication of how the doctrine of unclean hands would bar his claims.  145 F. Supp. 2d 371, 401 (S.D.N.Y. 2001).  Here, Chanel cannot now claim ignorance as to TRR's theory of unclean hands—given months and years of explicit notice by TRR.  There certainly has been

---

[27]   In fact, Chanel's production is already showing that TRR's unclean hands defense has merit.

no "change [to] the theory of [TRR's] defense."  (MTD 27.)[28]

     *Second*, TRR's unclean hands affirmative defense should survive as a matter of law.  The unclean hands doctrine is "recognized as a valid defense in an appropriate trademark infringement or unfair competition case."  *Estee Lauder, Inc.* v. *Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) (denying motion to strike unclean hands based on "antitrust misuse" theory in trademark infringement case).[29]   It is also well-established that "[a] motion to strike an affirmative defense under Rule 12(f) . . . for legal insufficiency is not favored."  *Id.* at 271.  That is because fact questions—such as whether the other party sought to block participation in the market or "attempt[ed] to misuse their trademarks for anticompetitive purposes"—"quite properly are viewed as determinable only after discovery and a hearing on the merits."  *Id.* at 272.

     Nevertheless, Chanel argues that "even if TRR was allowed to fundamentally transmogrify its unclean hands defense into an antitrust defense, [t]he Second Circuit has repeatedly emphasized the narrowness of the [unclean hands] doctrine's application."  (MTD 28.)   In making this argument, Chanel places great significance on *Carl Zeiss Stiftung* v. *V.E.B. Carl Zeiss, Jena*, which rejected an antitrust misuse defense where the defendant "charge[d] the plaintiff with a boycott, with conspiring to establish retail price control, and with various other matters . . . *but not that it*

---

[28]   Even in *France Telecom S.A.* v. *Novell, Inc.*, the court permitted the defendant to amend an affirmative defense from the singular sentence "[t]he Complaint and the relief requested therein are barred, in whole or in part, by the doctrine of unclean hands" to provide six short paragraphs stating the basis for the unclean hands defense, including the context of the alleged misconduct.  No. 102-437- GMS, 2002 U.S. Dist. LEXIS 19967, at *5-7 (D. Del. Oct. 17, 2002).  Similarly, if the Court were to find TRR's defense inadequate as pled, TRR should have opportunity to amend.

[29]   Unclean hands is also a valid defense to false advertising.  *See Haagen-Dazs, Inc.* v. *Frusen Gladie Ltd.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980).  Notably, Chanel no longer appears to contest the validity of TRR's unclean hands defense with respect to its false advertising claim—despite prior briefing before Judge Gorenstein.  (ECF No. 110.)  As previously argued, TRR alleges that Chanel has committed the same type of false advertising of which it accuses TRR.  TRR alleges that despite Chanel's own guarantees of authenticity, Chanel has sold counterfeit bags in its own boutiques.  (*See* Countercl. ¶ 63 & n.10; ECF No. 110-5.)  *Thus, TRR's unclean hands defense is based on Chanel's own guarantees of authenticity despite having sold counterfeit Chanel items in its boutiques.  See Haagen-Dazs, Inc.*, 493 F. Supp. at 76.  TRR also alleges Chanel made false statements on its website about the authenticity of Chanel items bought online and on secondary resale platforms like TRR. (Countercl. ¶¶ 56-59.)

*is using the trade-mark to do so.*" 298 F. Supp. 1309, 1314-15 (S.D.N.Y. 1969) (emphasis added). Critical to the court's holding was that the defendants provided no proof that plaintiffs "did deny, or threatened to deny, a dealer the right to use the [plaintiff's] trademarks unless he consented to engage in the alleged antitrust activities, or any proof that defendants sought to tie in the use of the [plaintiff's] trademarks with such activities." *Id.* at 1316. But the type of conduct that was lacking in *Carl Zeiss* is precisely what TRR alleges here: Chanel threatened to deny retailers the ability to use Chanel's trademarks by pulling Chanel handbags from their stores unless they reneged on their contracts with TRR, and Chanel used its dominance with publishers to secure their agreement not to run TRR's advertisements. (Countercl. ¶¶ 38-55.)

Ultimately, contrary to Chanel's contention that TRR does not allege that Chanel used its trademarks to monopolize the Relevant Markets, the gravamen of TRR's antitrust counterclaims is that Chanel has engaged in anticompetitive conduct in the Relevant Markets in a myriad of ways, including by blocking TRR from using, selling, or advertising the sale of Chanel handbags—*i.e.*, the same Chanel-trademarked items at issue in Chanel's lawsuit—by interfering with retailers and advertisers with which TRR had business relationships, denigrating secondary resellers as selling "likely fake" Chanel handbags, and misrepresenting authentication.[30] (*See id.* ¶¶ 34-71.)

## CONCLUSION

For the foregoing reasons, TRR respectfully requests that the Court deny Chanel's Motion to Dismiss TRR's counterclaims and Motion to Strike TRR's unclean hands affirmative defense.[31]

---

[30] Chanel's other cases—from Georgia and Wyoming—are factually inapposite. Neither involve misuse of the same mark at issue in the initial lawsuit. In *Coca-Cola Co.* v. *Howard Johnson Co.*, the court held that the defense did not apply where the plaintiff's alleged anticompetitive conduct concerned other trademark licensees who were not even parties to the litigation. 386 F. Supp. 330, 337 (N.D. Ga. 1974). In *Virgin Enterprises Ltd.* v. *Virginic LLC*, the court held that the defense did not apply where the only anticompetitive conduct at issue was litigation conduct that was non-actionable under *Noerr-Pennington*. No. 19-CV-0220, 2020 WL 1845232, at *4 (D. Wyo. Apr. 10, 2020).

[31] If the Court were to grant either of Chanel's motions, TRR requests an opportunity to cure any identified deficiencies, especially as this is Chanel's first motion to dismiss and first motion to strike. *See, e.g.*, *Mb Sportswear*, 2007 U.S. Dist. LEXIS 118397, at *7 (granting leave to amend to fix pleading deficiencies for antitrust claims).

Dated:          New York, New York
                April 1, 2021

                                    Respectfully submitted,

                                    /s/ Karen L. Dunn
                                    Karen L. Dunn (Admitted *Pro Hac Vice*)
                                    William A. Isaacson (*Pro Hac Vice*
                                    Forthcoming)
                                    PAUL, WEISS, RIFKIND, WHARTON &
                                    GARRISON LLP
                                    2001 K Street, NW
                                    Washington, DC 20006
                                    kdunn@paulweiss.com
                                    wisaacson@paulweiss.com

                                    Arianna Markel
                                    PAUL, WEISS, RIFKIND, WHARTON &
                                    GARRISON LLP
                                    1285 Avenue of the Americas
                                    New York, NY 10019
                                    amarkel@paulweiss.com

                                    Leigh M. Nathanson
                                    Laura E. Harris
                                    KING & SPALDING LLP
                                    1185 Avenue of the Americas 34th Floor
                                    New York, NY 10036
                                    lharris@kslaw.com
                                    lnathanson@kslaw.com

                                    *Attorneys for Defendant and Counterclaim-*
                                    *Plaintiff The RealReal, Inc.*